ILLINOIS POWER COMPANY, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14701–79.    Filed November 29, 1984.

---

*Edward C. Rustigan* and *William A. Schmalzl*, for the petitioner.

*Seymour I. Sherman* and *Thomas C. Borders*, for the respondent.

WILBUR, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income tax:

| TYE Dec. 31— | Amount |
| --- | --- |
| 1975 | $7,090,791.12 |
| 1976 | 644,094.74 |

After concessions, two issues remain for our consideration:

(1) Whether unit 3 of petitioner's Baldwin Power Station was *constructed by* the petitioner or *acquired by* the petitioner for purposes of computing the investment tax credit; and

(2) Whether amounts designated as "Rider R Income" collected from certain gas utility customers constitute taxable income in the year of receipt.

Some of the facts have been stipulated and are found accordingly. The several stipulations of fact and attached exhibits are incorporated herein by reference.

## FINDINGS OF FACT

Illinois Power Co. (hereinafter referred to as petitioner or Illinois Power) is an Illinois corporation with its principal office at Monticello, IL. Petitioner filed its Federal income tax returns (Forms 1120) for the taxable years ended December 31, 1975, and December 31, 1976, with the District Director of Internal Revenue at Chicago, IL. Petitioner has been, at all times here pertinent, engaged in the manufacture and sale of electric power to areas in central and southern Illinois aggregating approximately 15,000 square miles. During periods relevant to this case, petitioner also distributed and sold natural gas to approximately 350,000 commercial, industrial, residential, and certain seasonal consumers in the same geographical area.

## *Unit 3 – Baldwin Power Station*

Illinois Power is a public utility within the meaning of article I, section 10, of an act entitled "An Act Concerning Public Utilities," approved June 29, 1921, as amended and now in effect in the State of Illinois. This act is commonly referred to as the "Public Utilities Act." On August 24, 1966, petitioner filed a petition with the Illinois Commerce Commission (ICC), in which it alleged as follows: "To provide adequate operating and reserve capacity for its present and future electric power supply requirements in Illinois, it is necessary that petitioner construct and thereafter operate and maintain additional electric supply facilities." Illinois Power requested, inter alia, that the ICC issue a certificate of public convenience and necessity to construct, operate, and maintain a multiunit mine-mouth steam electric generating station and substation facilities in Randolph County, IL, to be known as the Baldwin Power Station. After a hearing, a certificate to the effect that public convenience and necessity required the construction,

operation, and maintenance of a unit steam electric generating powerplant was granted to petitioner on October 19, 1966.

As of December 12, 1966, Illinois Power owned or had under option approximately 3,546 of the 3,830 acres of land needed to construct the Baldwin Power Station. By a petition dated December 12, 1966, petitioner sought an order, which was subsequently granted, empowering it to use the power of eminent domain of the State of Illinois to obtain title or a perpetual easement to the additional 284 acres required for the construction, operation, and maintenance of the Baldwin Power Station.

Construction of the Baldwin Power Station commenced in March of 1967. Unit 1, with a generating capacity of 605 megawatts, went into commercial service on July 11, 1970.[1] The construction of unit 2 commenced in February of 1969. That unit, with a generating capacity of 605 megawatts, was placed in commercial service on May 21, 1973. The construction of unit 3 commenced in 1971. Unit 3, with a nameplate generating capacity of 585 megawatts, was placed in commercial service on June 20, 1975.

The construction of unit 1 included the construction or provision of many facilities which were intended to be and were in fact ultimately utilized in common by all three units, including the following: (1) 2000-acre cooling lake; (2) intake crib and pump house to pump water from Kaskaskia River to the cooling lake; (3) 600-acre ash pond; (4) centralized control room; (5) coal handling facilities, including trash hopper outlets, conveyors, bins, separators, and chutes; (6) railroad spur from Gulf, Mobile & Ohio Railroad; (7) railroad tracks to transport coal to coal handling facilities; (8) computer room; (9) circulating water system; (10) sewage disposal system; (11) parking lot; (12) fencing; and (13) fire protection system. A substantial part of the total construction costs of unit I was for the development of such common facilities and equipment for all three units.

The total cost as of December 31, 1976, of the three units at the Baldwin Power Station (as reported by Illinois Power to

---

[1]As early as Mar. 2, 1968, Illinois Power contemplated that the construction of the Baldwin Power Station would consist of three units, each of which could be operated independently of the others.

the ICC) was $346,903,816. These costs were broken down as follows:

| | |
|---|---:|
| Land and land rights | $2,587,911 |
| Structure and improvements | 80,128,638 |
| Equipment costs | 264,187,267 |
| Total cost | 346,903,816 |

Unit 3 of the Baldwin Power Station is an extremely complex facility consisting of hundreds of components and was technologically difficult to design and construct. It is approximately the height of a 24-story building, and the boiler alone weighs 10,000 tons. The total cost of unit 3 as computed from reports filed by the petitioner with the ICC, was as follows:

| | |
|---|---:|
| Structures and improvements | $31,638,686 |
| Equipment costs | 95,670,814 |
| Total cost | [2]127,309,500 |

In addition, the land and land rights for all three units amounted to $2,587,911.

Illinois Power had a construction department, but did not itself perform the physical construction work required when a new generating plant was built or an addition made to an existing plant. The primary function of petitioner's construction department was to oversee and monitor such work performed by outside contractors. Petitioner's construction department included approximately 24 supervisory and professional employees who were trained engineers. This number also included inspectors responsible for the construction work performed by contractors on petitioner's transmission lines and substation facilities. Illinois Power did not have sufficient personnel to construct a powerplant utilizing only its own employees.

Sargent & Lundy is an engineering partnership specializing in the design of steam-generated electrical power plants. Its

---

[2]Petitioner's total expenditures for the construction of unit 3 as of Dec. 31, 1974, as indicated in a report by its property and accounting section was $111,966,489. The total cost of unit 3 as of Jan. 29, 1976, as indicated in a later similar report was $123,968,503. As of Dec. 31, 1975, petitioner's total expenditures pursuant to specific contracts to which it was a party, and purchase orders issued in connection with the construction of unit 3, were in the amount of approximately $110 million. This amount is exclusive of costs incurred for land, company payroll, overhead, materials and stores, miscellaneous supplies and expenses, and costs incurred in excess of amounts authorized.

capabilities range from partial assistance in designing a project to complete construction management. The particular services it provides are determined by the requirements of the client. Sargent & Lundy itself does not engage in the physical construction of power plants. It views itself as a professional service organization, and its philosophy is that the professional services it provides should be separate from construction contracting and labor. Illinois Power has been a client of Sargent & Lundy since 1947. Since that time, Sargent & Lundy has designed every steam generating facility owned by petitioner, including all three units of the Baldwin Power Station.

In about 1969, Illinois Power requested Sargent & Lundy to assist in the design and construction of the third unit of its Baldwin Power Station in order to meet anticipated generating needs. Thereafter, Sargent & Lundy executed a service agreement with petitioner dated September 4, 1970, which specifies the services that it in fact performed in connection with the construction of unit 3.

The agreement provides that Sargent & Lundy shall, "at the request of" Illinois Power, perform the following specified services:

(a) Prepare and submit to Company [petitioner] as requested preliminary layout drawings showing arrangement and location of proposed said Project and assist Company in the choice and approval of the final layout and arrangement for construction purposes.

(b) Prepare and submit to Company specifications and electrical bills of material for all equipment and material required for the construction and installation of said Project, including generator and low voltage switching equipment, and as requested, assist representatives of Company in procuring prices for such material and equipment and in the choice of appropriate contractors and in the preparation of any contracts required therefor.

(c) Prepare and submit to Company designs and drawings in all necessary detail for the use of Contractors in the construction of said Project and for all purposes incident to the installation and placing in operation of said Project.

(d) Provide the desired number of field personnel to assist in construction activities to assure that the construction of said Project is in accordance with the specifications and designs therefor.

(e) Perform all other usual engineering services as may be necessary from time to time on account of the location, design, construction and placing in operation of said Project.

In performing the services required of it by its agreement with petitioner, Sargent & Lundy assigned many of its employees to work full time and many to work part time on the

project. "A couple of hundred" different individuals were involved in the engineering and design of the plant. The equivalent number of full-time employees was about 75 during the peak of construction.

The agreement also provides that Illinois Power will carry on the following activities in connection with the design and construction of unit 3:

(a) Approve final arrangement and layout for said Project, together with specifications, designs and construction drawings therefor.

(b) Purchase all equipment, material, and apparatus required for the complete installation and placing in operation of said Project.

(c) Engage and pay all contractors utilized in the installation and construction of said Project, and arrange for all necessary insurance required in the judgment of Company for the proper protection of Company during said construction procedure.

(d) Provide construction field manager and construction accounting forces, and arrange for the appropriate receipt of all materials and equipment and for the payment of all construction payrolls and of all personnel of Company located at the construction site.

(e) Perform or cause to be performed all other activities not hereinabove described and necessary for the complete installation and placing in operation of said Project.

As compensation for its services, petitioner agreed to pay Sargent & Lundy current expense charges as set forth in the agreement and, in addition, a flat engineering service fee of $800,000.

Sargent & Lundy prepared a "scope of work" document for unit 3. The preliminary draft and subsequent revisions dated August 22, 1972, and August 1974, all provide as follows:

This scope of work outlines the equipment and structures involved in the design and construction of the 585,500 kW Unit 3 at the Baldwin Power Station. Sargent & Lundy will furnish all structural, mechanical and electrical design as herein outlined. All field supervision will be furnished by the Illinois Power Company. Expediting of material and equipment will be done by the Illinois Power Company and Sargent & Lundy. Sargent & Lundy will review contract change proposals. Sargent & Lundy will provide job cost estimates to cover the following work * * *[3]

The overall design concept for the Baldwin Power Station was formulated by Sargent & Lundy after consultation with

---

[3]This provision is identical (with the exception of the unit specified) to the scope of work documents prepared with respect to the construction of units 1 and 2.

petitioner. Petitioner outlined the general criteria, such as electrical load requirements, plant location, and type of fuel required. The general design for unit 3 followed that used for units 1 and 2 and the Sargent & Lundy general outline for design.

Sargent & Lundy prepared more than 1,600 design drawings used in the construction of unit 3. In addition, it reviewed several thousand drawings prepared by manufacturers who supplied equipment for unit 3. Sargent & Lundy also prepared approximately 90 specifications with respect to materials, equipment, and supplies specifically engineered for unit 3. Such materials, supplies, and components were purchased directly by petitioner in accordance with contracts executed by petitioner and the respective suppliers or manufacturers. For example, specifications were prepared by Sargent & Lundy as part of the procurement process for a wide range of components such as the boiler, turbine, motors, pumps, heat exchange equipment, electrical switch gear, transformers, control systems, coal feed equipment, piping and tanks, valves, and miscellaneous water treating facilities. These specifications incorporated provisions that were tailor made to petitioner's unique requirements for performance, size, and guarantees. The specifications were part of a bid package that was assembled by Sargent & Lundy and released to a predetermined list of bidders. The list was initially prepared by Sargent & Lundy and submitted to petitioner for its concurrence. Although petitioner accepted most of Sargent & Lundy's recommendations, occasionally it exercised its discretion to strike from the list the names of certain bidders recommended by Sargent & Lundy. Invitations to bid were then forwarded to the bidders approved by petitioner.

Sargent & Lundy's internal office procedures required that it develop a document captioned "Outline of Procedure for Baldwin Power Station – Unit 3," which sets forth the procedures followed by Sargent & Lundy with respect to the purchasing of equipment by petitioner from various manufacturers and suppliers. Such general procedure was as follows: Sargent & Lundy would prepare the specifications and forward them, together with drawings and instructions for preparing a proposal, to the bidders approved by petitioner. The bidders were requested to submit the proposals directly to

petitioner, with copies to Sargent & Lundy. Sargent & Lundy would review the proposals and make its recommendation to petitioner of the bidder to be selected. Petitioner would then inform Sargent & Lundy in writing of its decision to award a contract to a particular manufacturer or supplier. Sargent & Lundy would thereupon notify the successful and unsuccessful bidders and prepare a contract for execution by petitioner and the successful bidder.[4]

Bids for other materials and supplies were obtained using a short-form or letter specification. Letter specifications were prepared by Sargent & Lundy for the purchase of standard materials, referred to as "shelf components." A shelf component is a standard manufactured product, generally costing less than $25,000. For example, a letter specification to a particular manufacturer might indicate the specific model number and style desired by petitioner. Sargent & Lundy would review any proposals or bids submitted, and make its recommendation to petitioner. If petitioner agreed to the vendor recommended by Sargent & Lundy (which was invariably the case), it would then issue a purchase order to that vendor.[5]

Petitioner executed 45 separate contracts for the manufacture, installation, or construction of components with specifications tailored to its particular needs and requirements. The specifications prepared by Sargent & Lundy were incorporated into each such contract. Sargent & Lundy negotiated the contracts with each of the manufacturers or suppliers. Four of these contracts were for the purchase of both field labor and materials. These contracts and each respective initial contract price were as follows:

---

[4] Employees of petitioner in its purchasing, power supply, engineering, and construction departments would review Sargent & Lundy's recommendations. Purchase orders would be issued by petitioner to a vendor simultaneously with the execution of a contract for the purchase of equipment or materials.

[5] Some electrical equipment and materials were purchased directly by petitioner using a "bill of material" prepared by Sargent & Lundy. A bill of material was the form used by petitioner to purchase smaller items such as switches, relays, and other components for electrical circuitry.

| Contractor | Specification | Initial contract price |
|---|---|---|
| Baldwin Associates | T–2808 | $55,200,000 |
| Grinnell Co. | T–2871 | 83,525 |
| Sprinkmann Sons Corp. | T–2875 | 1,544,621 |
| Superior Welding | T–2842 | 47,642 |
| Total | | 56,875,788 |

The remaining 41 contracts were for the purchase of equipment and components manufactured and/or supplied in accordance with contract specifications prepared by Sargent & Lundy. The initial contract prices of these contracts totaled approximately $40 million.

Each manufacturer or supplier was required, if and when requested, to permit petitioner to inspect both the materials used in any fabrication of equipment and the actual fabrication process itself. Petitioner also had the right to observe production tests and to direct the manufacturer or supplier to make such changes as it might deem necessary. Suppliers of equipment were in some instances required to conduct certain tests in connection with the manufacturing process. These tests were required to assure that the equipment would meet the specifications prepared by Sargent & Lundy. After its review of the test results, Sargent & Lundy would forward them to petitioner. Purchase orders were issued by petitioner to the respective manufacturers or suppliers, and each such manufacturer or supplier was paid by petitioner. Legal title to the specified equipment and supplies were transferred to petitioner prior to delivery to the jobsite. Invoicing, shipping, and routing instructions were issued by petitioner directly to the suppliers and manufacturers, and delivery was made directly to the jobsite. A warehouse for the storage and safeguarding of equipment and materials was located at the construction site, and an employee of petitioner maintained an inventory of all items in the warehouse.

Four contractors (Power Systems, Fruin-Colnon, Kelso-Burnett, and McCartin-McAuliffe), at the suggestion of Power Systems, formed Baldwin Associates, a joint venture, pursuant to an agreement dated February 28, 1967. Baldwin Associates was organized for the specific purpose of constructing the initial unit (unit 1) at petitioner's Baldwin Power Station. Each venturer provided a different expertise needed in the

construction of powerplants. Power Systems provided expertise in mechanical contracting, Fruin-Colnon in civil engineering, Kelso-Burnett in electrical contracting, and McCartin-McAuliffe in the installation of piping.[6]

The first recital in the joint venture agreement provides that the joint venture will construct unit 1 "under the general supervision and to the satisfaction of Owner [petitioner] and Owner's Consulting Engineers [Sargent & Lundy]." Baldwin Associates commenced work on Baldwin unit 1 in 1967. By amendment dated September 1, 1969, the joint venturers agreed to expand the scope of the joint venture to include the execution of a contract with petitioner for the construction of unit 2 at petitioner's Baldwin Power Station. The construction of unit 2 commenced in February 1969, while unit 1 was under construction. By amendment dated August 6, 1971, the joint venturers agreed to expand the scope of the joint venture to include the execution of a contract with petitioner for the construction of unit 3 of petitioner's Baldwin Power Station. Construction of unit 3 commenced in 1971.[7]

The actual physical construction of all three units of petitioner's Baldwin Power Station was performed by Baldwin Associates. This construction included the erection of the superstructures and shell and the installation of the equipment and components. The procedures followed in the construction of all three units were substantially identical, with the exception that on unit 3, Baldwin Associates assumed the additional duties of erecting the turbine and steam generator.

On or about June 2, 1971, Baldwin Associates was requested to prepare a proposal for the construction of unit 3. A contract dated July 30, 1971, and executed on February 23, 1972, between Baldwin Associates and petitioner for the construction of unit 3 sets forth the duties and obligations undertaken

---

[6]Power Systems is a mechanical contractor specializing in powerplant construction, with areas of expertise in the installation of piping systems, mechanical equipment, and boilers and turbines. Fruin-Colnon is a construction company which has engaged in major construction projects since 1908. Kelso-Burnett is a contracting company engaged primarily in electrical construction. McCartin-McAuliffe is a mechanical contractor with expertise in the installation of specialized piping in the petro-chemical, steel, and electric utility industries. Each of the foregoing four firms is itself a major firm within its area of expertise and has numerous clients in addition to petitioner.

[7]A principal advantage of a joint venture in construction is that the business is conducted in the name of the joint venture, thus enabling petitioner and Sargent & Lundy to deal with one spokesman rather than several. Petitioner and Baldwin Associates specifically agreed that a single spokesman would represent Baldwin Associates in their discussions.

by Baldwin Associates in connection with the project. This contract provided for a fixed fee to Baldwin Associates in the amount of $3,500,000. On the same date, the parties executed an amendatory contract for the construction of unit 3 on a cost plus fixed fee basis because Illinois Power believed that the construction could be done at a lower cost if Baldwin Associates' employees believed that unit 3 was a lump-sum project.

Sargent & Lundy drafted the contract between Baldwin Associates and petitioner. It included certain clauses specifically requested by petitioner, and was approved by petitioner and its counsel before submission to Baldwin Associates.

The work to be performed by Baldwin Associates as set forth in an exhibit to the contract consisted of the following general phases: (1) Contractor's tooling and mobilization; (2) initial unit 3 construction area preparation work; (3) substructure work; (4) superstructure work; (5) coal handling extension work; (6) piping work; (7) erection of mechanical equipment and materials including the steam generator and turbine generator and associated appurtenances; and (8) electrical work.

Baldwin Associates was required to complete the work in a manner satisfactory to Sargent & Lundy and to petitioner,[8] and was also required to furnish "A complete project organization, both on and off the site, as required to administer, manage and supervise the WORK to complete satisfaction of Purchaser [petitioner] and to complete the specified WORK ready for successful commercial operation by the scheduled date."

Section 9 of the contract gives petitioner the right to order Baldwin Associates to employ more men, machinery, construction equipment, tools, etc., if petitioner determines that Baldwin Associates is not carrying on the work with the diligence necessary to complete it in accordance with the schedule provided in section 3 of the contract. Section 9 also sets forth 13 specifications and conditions, under which petitioner may terminate its contract with Baldwin Associates and

---

[8] The contract allowed petitioner to change the scope of the work while unit 3 was being completed by Baldwin Associates. The purpose of the contract provisions permitting petitioner to exercise certain rights was to give Illinois Power the ability to control costs, to maintain the schedule, and to insure quality. Such provisions are typical in contracts for the construction of powerplants.

take possession of the work or any part of the work for the purpose of completing it in such manner as petitioner may deem expedient. Such termination allows petitioner to take possession of all materials, equipment, tools, and appliances on the jobsite, and, in addition, gives petitioner the right to employ one or more of the joint venturers to complete the project. Baldwin Associates also agreed to indemnify and hold harmless and defend petitioner and Sargent & Lundy from all liability under the Illinois "Structural Work Act." Baldwin Associates agreed to pay all damages, costs, and expenses, including attorney's fees, that might arise in connection with any such action against either petitioner or Sargent & Lundy.

Exhibit A, Exhibit A-1, Exhibit B, and Exhibit C to the contract between petitioner and Baldwin Associates were expressly incorporated into and made a part of such contract. Article 1 of Exhibit A to the contract provides that the work done by Baldwin Associates shall be in conformity with the instructions provided by Sargent & Lundy and that Baldwin Associates shall not do any part of the work without proper drawings and instructions from Sargent & Lundy. Contractors and installers other than Baldwin Associates performed work on unit 3. Baldwin Associates was not permitted to cut or alter the work of any other such contractor without the authorization of petitioner or Sargent & Lundy.

Sargent & Lundy had the authority to interpret the contract documents and all specifications and drawings issued by them and was empowered to issue final and conclusive decisions with respect to the interpretation of the contract documents, or in resolving disputes which might arise between the contracting parties, or between Baldwin Associates and other contractors. Sargent & Lundy was also required to observe the work in progress on behalf of petitioner.

Baldwin Associates was required to furnish for approval samples of work as and when requested by Sargent & Lundy. Additionally, petitioner and Sargent & Lundy had the right at all reasonable times to inspect and test the work. Petitioner could reject any work it found defective or not in accordance with the contract specifications. If a dispute arose regarding petitioner's determination that the work was defective or not in conformity with the contract, Sargent & Lundy was empowered to issue a final and conclusive decision resolving such

dispute. Baldwin Associates was required at its own expense to remove or replace any work so rejected. If Baldwin Associates did not remove, replace, or restore such work within a reasonable time, petitioner was empowered to do so at Baldwin Associates' expense. Baldwin Associates was also required to cause its books and records to be audited by a firm of certified public accountants mutually agreed upon by it and petitioner.

Petitioner provided insurance against (or assumed the risk of) physical loss or damage to the work caused by fire and extended coverage perils, vandalism and malicious mischief, weather, explosion, and additional perils normally insured under an "all risk" from subject to the usual exclusions. Pursuant to such provision, petitioner paid Baldwin Associates approximately $710,000 for the additional costs incurred by the latter in connection with the repair of a cofferdam that collapsed during the construction of unit 3. Baldwin Associates was not permitted to assign or subcontract any part of its work without petitioner's prior written approval.

Baldwin Associates was required to install, erect, and finish the following work:

E. WORK INSTALLED ONLY: Contractor shall unload and place, or shall unload and store materials for, and shall remove materials from storage for, and shall, install, erect, perform and finish the following phases comprising this portion of the WORK: materials specified will be furnished, unless otherwise indicated, f.o.b. site by Purchaser:

a. Substructure Work: * * *

b. Piping Work: This shall include all control valves and miscellaneous local instrument panels.

c. Erection of Structural Steel.

d. Erection of Mechanical Equipment and Materials:

(1) Steam generating unit * * *

(2) Turbine generator unit and two steam turbine boiler feed pump drives, and piping, wiring and trim furnished therewith * * *

(3) This shall include all miscellaneous mechanical equipment listed in Article * * *

       *      *      *      *      *      *      *

e. Electrical Work: This shall include all electrical equipment * * * such as, but not limited to, the following:

(1) Turbine-generator, generator neutral grounding equipment, P.T. compartment, and exciter.

(2) Transformers, power and lighting.

(3) Isolated phase bust [sic] duct including all accessories; bus is forced air cooled.

(4) Switchboards and control panels, computers, and recording annunciator.

(5) Metal-clad switchgear.

(6) Motor control centers.

(7) Station battery charger.

(8) Precipitator.

(9) Motors (conduit and wiring only).

(10) Motor control panels and stations.

(11) Diesel generator.

(12) Pushbutton stations.

(13) Pressure switches, relays, window annunciators, meters, and indicating instruments mounted separately.

(14) Public address system.

(15) Telephone equipment.

(16) Cable pans and racks and computer trays.

(17) 345 kV and 138 kV substation equipment including 345 kV breakers and 138kV circuit switcher.

(18) Power and control cables, nonsegregated bus and wire (except No. 8 and smaller single conductor for permanent or temporary lighting).

All equipment, components, and materials specified above were owned by petitioner at the time of their installation and/ or erection by Baldwin Associates. Baldwin Associates had no voice in the selection by petitioner of any of the suppliers of such equipment, components, or materials.

Exhibit B to the contract between petitioner and Baldwin Associates specifies the following major items of equipment purchased by petitioner from various suppliers and manufacturers, which Baldwin Associates was required to erect: (1) Steam generating unit; (2) turbine generating unit; (3) turbine-driven boiler and motor-driven feed pumps; (4) condenser equipment; (5) circulating water pumps; (6) main condensate pumps; (7) electrostatic dust precipitator; (8) vacuum pumps; (9) coal feeders; (10) fly ash and bottom ash; (11) deaerating heater; (12) supplement-coal handling; (13) fans; (14) closed feedwater heaters; (15) miscellaneous tanks; (16) heater drain pumps; (17) miscellaneous pumps; (18) miscellaneous heat exchangers; (19) combustion air preheat coils; (20) service water pumps; (21) extraction steam check valves; (22) water preventing and demineralizer equipment; (23) air dryer; (24) traveling screens; (25) butterfly valves; (26) service water strainers; (27) rubber expansion joint; and (28) piping work.

Prior to the commencement of actual physical construction, Baldwin Associates was required to submit to Sargent &

Lundy for review and approval a detailed construction progress plan. This plan consisted in part of a graphic network which depicted and described the interdependence of all activities of Baldwin Associates, including its subcontractors and its material suppliers, the subcontractors and material suppliers of petitioner, and the interdependence of these activities with significant activities of petitioner and Sargent & Lundy.

Baldwin Associates and Sargent & Lundy together prepared two preliminary construction schedules dated April 22, 1971, and June 25, 1971, which outlined the various phases of construction and estimated time required for the completion of each phase. These two preliminary construction schedules were submitted to petitioner for review and comment. Baldwin Associates also prepared its own preliminary construction schedule dated October 20, 1971, which it submitted to petitioner. This schedule followed the same general format as those which it had previously prepared together with Sargent & Lundy. This later schedule contained revisions by Baldwin Associates to accommodate the equipment delivery dates proposed by Sargent & Lundy, and reflected current estimates by Baldwin Associates of the time required to complete certain parts of the job. The construction schedule finally adopted is dated March 16, 1972. The revisions incorporated in that schedule were based upon agreements reached between petitioner and Baldwin Associates.

Petitioner was quite concerned about the timeliness of construction, and in particular, that the proposed construction schedule meet the date it selected to bring the power plant into commercial operation. Petitioner wanted unit 3 to be commercially operable in time to meet the summer 1975 peak demand for electricity and accordingly, unit 3 was constructed under a very tight schedule.

Throughout the course of construction, Baldwin Associates hired subcontractors in areas where its own employees lacked expertise. For example, it hired subcontractors to glaze windows and to install the tile floor. When work was to be done by subcontractors, formal written specifications were to be prepared by Sargent & Lundy and provided to prospective bidders. Whenever Baldwin Associates would hire a subcontractor or purchase supplies, it would first obtain petitioner's

approval. Baldwin Associates purchased construction materials such as steel, concrete, piping, and roofing, but did not purchase any of the major plant equipment or components.

Baldwin Associates was required to erect or install the structural steel. Petitioner obtained the services of a testing laboratory, Pittsburgh Testing Lab, to inspect the strength, erection, and connections of the structural steel as so installed. Baldwin Associates was required to correct defects when and as determined by the laboratory.

Baldwin Associates was required to clean all bearings of equipment it.erected, and to clean and flush all lubricating oil systems of equipment that interconnected. Lubricating and flushing oil used for this purpose was furnished by petitioner, and the methods of cleaning and flushing had to be approved in advance by the equipment manufacturers and by Sargent & Lundy.

The contract between petitioner and Baldwin Associates required that the latter obtain from the manufacturers a detailed scope of the work required to completely erect the following equipment, all of which was purchased directly by petitioner: (1) Steam generator; (2) turbine-generator, b.f. pump turbine drive; (3) condensing equipment; (4) boiler feed pumps; (5) electrostatic dust precipitator; (6) fans; (7) coal feeders; (8) coal handling; (9) vacuum pumps; (10) structural steel.

On February 23, 1972, an amendment was executed to the contract between Baldwin Associates and petitioner, specifying those costs included in the fixed fee payable to Baldwin Associates and those payable directly by petitioner. Costs payable directly by petitioner were as follows:

1. Cost of all labor, including supervisory personnel. Overtime work (other than "spot" overtime) shall only be performed when authorized by Purchaser; such overtime shall be paid for by Purchaser as a cost of the Work except when the same is necessitated by the neglect of Contractor.

2. Cost of all supplies, material, small tools, machinery and equipment used or incorporated in the Work. Small Tools, machinery and equipment included herein shall be limited to a cost of ONE THOUSAND ($1000.00) DOLLARS each (except as may be otherwise mutually agreed upon). All other items shall be included as rental equipment provided for in Paragraph 5 or 7 below.

3. Freight, cartage and transportation charges, including on-site loading, unloading and handling charges.

4. Subcontracts, subject to Purchaser's approval, which shall be lump-sum wherever practicable.

5. Rental charges for items of equipment, machinery or appliances furnished by any of the Joint Venture Partners, and assigned to the job site for ten (10) months, or longer, will be made at the monthly rate of 66⅔% of the then current A.E.D. rental schedule. For periods of assignment less than ten (10) months, the rental charge shall be 75% of the current A.E.D. rental schedule.

Pursuant to the February 23, 1972, amendment, Baldwin Associates routinely provided petitioner with a list of tools stolen from it during the construction of unit 3. Petitioner would then reimburse it for the cost of such stolen items.

It was anticipated that certain changes in the scope of the work ("extras") provided by individual contractors and manufacturers would occur as construction progressed. Some such changes were recommended by petitioner's employees operating units 1 and 2. These proposed changes, after approval by petitioner and Sargent & Lundy, were incorporated into the design of unit 3 to prevent a recurrence of certain problems which had developed during the operation of units 1 and 2.

As of December 31, 1975, the total cost of the change orders authorized for Baldwin Associates approximated $3,500,000. Whenever such changes were required, Sargent & Lundy would furnish additional drawings and specifications to the contractor. The latter would then prepare a supplementary proposal which Sargent & Lundy would review and forward to petitioner for acceptance. If petitioner agreed with Sargent & Lundy's recommendation, it would then issue a purchase order change for the work.

If a supplier was a subcontractor of Baldwin Associates, the latter would transmit drawings to Sargent & Lundy for approval. Sargent & Lundy would review the drawings, make changes it deemed appropriate, and return them to Baldwin Associates for its use in construction.

Baldwin Associates was required to submit design drawings, as well as shop drawings showing such matters as erection layout, to Sargent & Lundy for approval. It was not permitted to commence work pertaining to any such shop drawing until notified by Sargent & Lundy. Baldwin Associates could not commence particular phases or parts of erection or construction until authorized by Sargent & Lundy through transmittal of the final drawing.

Mississippi Valley Structural Steel (MV) contracted with petitioner to supply the structural steel to be erected by Baldwin Associates, and was supplied with certain drawings by Sargent & Lundy, indicating the general nature and type of structural steel to be furnished. MV was required to prepare and submit shop drawings to Sargent & Lundy, and was not permitted to start fabrication until it obtained Sargent & Lundy's written approval.

The profit and loss statement of Baldwin Associates as of December 31, 1975, indicates that costs incurred for labor in the performance of its contract with petitioner were in the amount of $25,283,320, exclusive of charges for extra work. The same statement reveals that Baldwin Associates incurred costs of $22,489,063.96 for materials, which included $10,944,530.79 for overhead, plant, insurance, and taxes.

Petitioner and Baldwin Associates discussed progress throughout the course of the construction of unit 3 at regularly scheduled monthly meetings. These meetings were held at petitioner's offices in Decatur, IL, and were attended by the board of directors of Baldwin Associates, representatives from Sargent & Lundy, and various employees of petitioner. The general purpose of such meetings was to enable petitioner and Baldwin Associates to discuss job progress and to fully apprise petitioner of any problems affecting the project. The project manager would present a job progress report to petitioner at each such meeting. Topics of discussion at such meetings included problems with the various unions, manpower needs, delays in equipment installation, delivery of materials and equipment, changes in specifications, shipping schedules, Sargent & Lundy specifications and drawings, general problems regarding specific equipment installations, plant security, startup procedures, and schedule changes.

Robert Born, an employee of Power Systems (the sponsoring partner of Baldwin Associates), was the project manager for the construction of the Baldwin Power Station from August 1, 1969, through March 31, 1974. As of April 1, 1974, he was transferred to a powerplant at Clinton, IL, which was also being constructed by Baldwin Associates for petitioner. His assignment to the Clinton project was with petitioner's approval.

Ivan Cochran, an employee of a subsidiary of Fruin-Colnon, assumed the position of project manager on April 1, 1974. As project manager, he had overall responsibility for managing the employees of Baldwin Associates and the craftsmen and laborers involved in the actual field construction work. His duties were primarily administrative, and most of his responsibilities were delegated to subordinates, to whom were assigned specific areas of responsibility.

The project manager had a staff that consisted of an office manager, assistant project manager, safety engineer, and project engineer. Each member of the staff, in turn, supervised employees subordinate to him. The assistant project manager was responsible for the field operations and had a staff consisting of the electrical superintendent, civil superintendent, piping superintendent, equipment and batch plant superintendent, boilermaker superintendent, and turbine superintendent.

All members of the supervisory staff were employees of the various partners to the joint venture, as were most of the engineers and assistant superintendents. The supervisors of the joint venture were furnished by the partners, based upon their respective specialties. Fruin-Colnon furnished civil engineering superintendents; Power Systems provided boilermaker and turbine superintendents; piping superintendents were provided by McCartin-McAuliffe; and Kelso-Burnett furnished the electrical superintendents.

The persons furnished by the individual partners or venturers remained employees of the same respective entity while assigned to the Baldwin Project and were paid directly by their respective employers. Determinations as to the salaries and any increases in salary payable to such employees were within the sole discretion of the respective employers of such persons.

Baldwin Associates itself employed various craftsmen, such as boilermakers, carpenters, welders, and ironworkers, hiring such persons out of union halls. Under typical hiring procedure, a superintendent would call a union business agent and specify the number and type (by craft or specialty) of craftsmen desired. Foremen were also obtained by Baldwin Associates through the union halls. Such foremen were directed by the various superintendents provided to the joint venture by the partners. The number of craftsmen working at any given

time on unit 3 varied, ranging from approximately 700 in March of 1974 to an average of 200 from September 1972 to January 1973.

Wes Divin was an engineer assigned by Sargent & Lundy as its field representative on the Baldwin project. Sargent & Lundy was paid by petitioner for the cost of his salary, plus specified allowances. One of Divin's functions was to interpret Sargent & Lundy field drawings when requested by a contractor. When unable to solve a design problem himself, he would obtain help from Sargent & Lundy's home office. Mr. Divin had no authority to give orders to a contractor.

As part of his job duties, Divin prepared a document entitled, "Construction Progress Report," on a weekly basis. Each such report summarized the major construction activity that had occurred since the last report. He also prepared a construction manpower report which was attached to each progress report and, inter alia, lists the manpower on the jobsite supplied by various contractors and by petitioner.

It was important that suppliers of material and equipment make deliveries in conformance with their contracts with petitioner, so that construction would proceed in accordance with the schedule. Petitioner obtained, through a contract with Power Systems, an "expediter" for the project, who was stationed at the powerplant, and whose sole function was to assure the delivery of supplies and equipment to the jobsite as and when needed. The expediter, Harold Carmichael, used petitioner's stationery, and wrote letters on petitioner's behalf to suppliers, coordinating the delivery of equipment to the jobsite.

It was petitioner's policy to assign engineers from its construction department to monitor the construction and design of new generating units. Three such engineers in petitioner's office in Decatur, IL, involved in the construction of unit 3 were R.L. Martin, manager of construction, Thomas E. Daggett, assistant manager of construction, and John Steinman, powerplant design engineer. The collective responsibility of Martin and Daggett was to review and monitor the work of Sargent & Lundy and to supervise other persons from petitioner's construction department who had been assigned to the jobsite in order to more directly monitor construction activity on unit 3.

Steinman was involved in the budgeting for unit 3 and reviewed billings, as well as drawings, prepared by Sargent & Lundy. The drawings were reviewed to assure that the plant would operate as desired by petitioner.

Al Ruey, an engineer in petitioner's engineering department, reviewed electrical design drawings prepared by Sargent & Lundy. His function was to make certain that the electrical systems as proposed by Sargent & Lundy would conform with petitioner's operational needs. Ruey, assisted by another employee of petitioner, Mr. S.C. Patel, reviewed Sargent & Lundy's electrical drawings and suggested changes pertaining to relay settings, electrical connections, and electrical circuits.

Petitioner stationed several other employees, in addition to those already mentioned, at the Baldwin Power Station during the construction of unit 3. Those employees, and their job titles, were as follows:

| | |
|---|---|
| Robert J. Canfield | Powerplant construction engineer |
| William L. Calhoun | Electrical engineer |
| John M. King | Electrical engineer |
| Michael L. Keckritz | Mechanical engineer |
| Gary A. Schenck | Electrical engineer |
| Thomas L. Stomberski | Electrical engineer |
| James T. Koeper | Assistant mechanical engineer |
| Robert J. Fuhrmann | Junior accountant |
| Leo Hinton | Storekeeper |

Fuhrmann and Hinton were the only clerical employees assigned by petitioner to the unit 3 jobsite. The latter was responsible for maintaining an inventory of all items stored in the warehouse at the jobsite. The warehouse contained equipment and supplies owned by petitioner, to be installed in unit 3, except that items too large for the warehouse were kept on the plant floor. Petitioner inspected equipment prior to its storage in the warehouse, and made certain that the necessary paperwork was completed to support the billings. It was petitioner's own responsibility to make certain that goods shipped to it were received in good condition.

Canfield, Calhoun, Grammer, King, Keckritz, Schenck, Stromberksi, and Koeper were engineers employed in petitioner's construction department. Canfield was assigned to the construction site of the Baldwin Power Station from the spring

of 1967 to July 1975, and was petitioner's senior representative at that site. A major part of his responsibilities was to make certain that unit 3 was built in accordance with petitioner's plans, and that the work on unit 3 was in accordance with the specifications set forth in the various contracts.

The principal duty of Canfield, Calhoun, King, and Grammer with respect to Baldwin unit 3 was to monitor the work of Baldwin Associates as unit 3 was being constructed. Their principal task was to assure that unit 3 was timely built in accordance with the contract specifications, and at a reasonable cost. They were required to walk around the jobsite several times a day in order to be certain that they were familiar with the work currently being done.

Canfield held numerous meetings at the jobsite with representatives of Baldwin Associates to coordinate the progress of the work and discuss any anticipated problems. To insure that he was fully informed of the day-to-day problems, he spent approximately 50 percent of his time touring the plant site and checking on actual construction, and he discussed job progress on almost a daily basis with the project manager and assistant project manager of Baldwin Associates.

Canfield was provided with a complete set of Sargent & Lundy design drawings for his use at the jobsite. These drawings would be used in discussions he would have with Baldwin Associates regarding a particular field or engineering problem. He would also receive copies of all Sargent & Lundy drawings released for fabrication or construction, and manufacturers' detailed and shop drawings approved by Sargent & Lundy, as well as copies of the manufacturers' instruction books for major equipment. Canfield's discussions with Baldwin Associates frequently focused on problems relating to the scheduling of the work, as it was his responsibility to make certain that work schedules were met. Whenever delays caused by power outages, work stoppages, or strikes required revision of work schedules, Canfield would work with Baldwin Associates in making necessary revisions.

As provided in its fixed-fee contract with Baldwin Associates, petitioner paid the cost of all labor on the jobsite. Canfield was consequently concerned with the productivity of the craftsmen, and that they adhere to starting, quitting, and

coffeebreak times. Whenever he believed that the craftsmen were not working properly or with sufficient diligence, he would so advise the contractor responsible. On one occasion, Canfield was concerned with the job attitude and demeanor of a craftsman who had gotten into a fight with another craftsman, and recommended to the employing contractor that the offending employee be terminated.

Petitioner had a contract with Marsh & McClennan, insurance specialists, requiring periodic inspection of the plant site for fire hazards. Canfield would receive a copy of inspection reports prepared by Marsh & McClennan, and would order individual contractors to correct any problem noted. He would make recommendations concerning job safety to the safety engineer for Baldwin Associates, and fully expected Baldwin Associates to comply with his recommendations.

Contractors were not permitted to perform any work beyond the scope of work specified in their respective contracts with petitioner, without first obtaining petitioner's approval. Both Canfield and Sargent & Lundy's field representatives would first have to agree that the work was necessary and not covered by an existing contract, before an "extra" or change could be authorized. If it was so approved, Canfield would then issue a field requisition. The contractor could not start such work unless first issued a purchase order, or specifically notified by requisition that it could proceed. Any change in excess of $500 required the approval of Martin, petitioner's manager of construction.

Canfield would review all invoices submitted for payment by manufacturers, suppliers, and contractors. It was his responsibility to determine that the equipment and materials specified on the invoice were received in good condition, and that any field work was actually performed. He was also required to determine that unit prices, wage rates, and hours of labor specified on an invoice were correct. If Canfield was satisfied that an invoice was correct, he would initial a copy and forward it to Sargent & Lundy. Sargent & Lundy would advise petitioner of its agreement to the payment by issuing a certificate of payment. An invoice approved by both Canfield and Sargent & Lundy would then by given to Daggett, petitioner's assistant manager of construction, before payment would be made.

Equipment installations completed by Baldwin Associates were turned over to petitioner in discrete units. As and when Baldwin Associates would complete the installation of certain components, equipment, and systems, petitioner would be notified by memorandum referred to as a "release." The specific purpose of the release was to inform petitioner that Baldwin Associates had completed the installation of the equipment and that it was ready to be checked out by petitioner. After receipt of such release, petitioner's employees would examine the equipment to determine if it had been properly installed. Once this was done, the specific items and equipment listed in the release became the sole responsibility of petitioner.

Installation of the equipment was routinely inspected by engineers from petitioner's construction department. In some instances, petitioner's engineer would be accompanied by an employee from its operations department who was familiar with the particular piece of equipment installed. An operations department employee of petitioner was one who at that time was permanently assigned to a position in the operation of either unit 1 or unit 2.

"Checkout reports" are prepared by engineers from petitioner's construction department when, during the checkout, it is determined that equipment is defective, or must be removed or altered for design changes. Each "checkout report" specifies the problem or imperfection detected by the engineer and any action taken by him to correct the problem. Some corrections were made on the spot by the engineer.

Throughout the course of the construction of unit 3, Baldwin Associates and petitioner would inform the plant manager of petitioner's powerplant by joint memorandum as and when a given equipment installation by Baldwin Associates was complete. Such memoranda were sent only after both Baldwin Associates and engineers from petitioner's construction department had examined the equipment and determined it to be operational. The specific purpose of such joint memoranda was to inform the plant manager that the designated equipment should be examined and tested by operations personnel who were responsible for operating similar types of equipment. Tests were then subsequently completed by employees of petitioner to assure that the equipment was fully operational.

The checkout of unit 2 required 6,599 man-hours of electrical personnel and 7,042 man-hours of control and instrumentation personnel. The electrical personnel consisted of petitioner's checkout engineers, and control and instrumentation personnel consisted of technicians employed by petitioner in the operations department of the powerplant. Whenever operating personnel were needed to assist in checking the various components, one of petitioner's checkout engineers would contact the plant manager and request assistance.

The record does not fully disclose the total checkout time required for unit 3. Petitioner's estimate, as of April 3, 1974, of man-hours required for its engineers to complete the electrical checkout of unit 3 was 8,248 hours. Its estimate, as of April 3, 1974, of man-hours required for its control and instrumentation personnel to complete the checkout of unit 3 was 8,802 hours. More personnel and greater involvement by petitioner were required in the checkout of unit 3 than were necessary for unit 2, because petitioner needed more time to inspect the turbine and boiler for unit 3. When petitioner's checkout engineers located a problem with respect to a particular piece of equipment, they frequently dealt directly with the equipment manufacturer to resolve it. This generally proved to be the fastest and most efficient way to proceed.

From November of 1971 through March of 1974, Sargent & Lundy prepared monthly engineering reports for petitioner, essentially consisting of a detailed summary of progress on the job. Such reports, inter alia, summarized the status of the Sargent & Lundy design work, listed the major equipment purchased since the previous report, informed petitioner of specifications currently being prepared by Sargent & Lundy, and outlined the status of the drawings being prepared by various departments within Sargent & Lundy.

On two occasions, petitioner was the defendant named in personal injury suits arising from the construction of the Baldwin Power Station. One such case was filed in the Third Judicial Circuit Court of Illinois, Madison County, and the other in the Twentieth Judicial Circuit Court of Illinois, St. Clair County. It was alleged in each case that petitioner was liable under the Illinois Structural Work Act for injuries sustained by the plaintiff while working on the construction of the Baldwin Power Station. In each case the court found in

favor of the plaintiff and against petitioner, holding petitioner liable to the plaintiff for the injuries sustained, following the finding that petitioner was in charge of, or had the right to be in charge of, construction at the Baldwin Power Station.

In the notice of deficiency dated July 18, 1979, respondent determined that Illinois Power was entitled to a 10-percent investment tax credit for only that portion of unit 3 of the Baldwin Power Station constructed after January 21, 1975. For the portion of unit 3 constructed prior to that date, petitioner was allowed only a 4-percent credit.

## *Rider R*

As a regulated public utility, Illinois Power must obtain approval from the Illinois Commerce Commission (ICC) prior to implementing changes in rates, service classifications, or other conditions or circumstances of service to its gas customers. To obtain such approval, petitioner must file proposals with the ICC, which normally renders a decision within 11 months thereafter. During that period, Illinois Power and any interested parties opposed to the requested change may offer evidence or present arguments in support of their respective positions.

Petitioner's gas customers comprise several different classifications, including residential (the largest and highest priority class), general service, industrial, and interruptible. Each of such classifications is subject to different rates. A classificatory distinction existing during and prior to the taxable years here in controversy was between "firm" and "interruptible" gas service customers. These categories related to priority of service during times of gas shortages. Interruptible gas customers consisted generally of industrial customers using gas for boilers and having alternate fuel capability. These customers had the lowest priority and were charged a lower rate because the gas sold to this class consisted of that available within petitioner's system, but for which no additional investment in facilities was required.

The priority rules governing service during periods of shortage first became effective in 1970, pursuant to a petition filed by Illinois Power with the ICC on July 7, 1970. By order dated March 3, 1971, the ICC formally approved the priority rules sought by petitioner in that proceeding, with certain

modifications. Those rules, however, only established a priority system for controlling the addition of any significant new gas demand, by authorizing the deferral of action on applications for service during periods of insufficient gas supply. They did not provide for limitation of gas service to existing customers to meet deficits due to shortages resulting from curtailments imposed upon petitioner by its suppliers.

Petitioner obtains gas from several interstate pipeline companies. In the early 1970's, these suppliers experienced difficulties in meeting their commitments to customers and, accordingly, curtailed deliveries. On September 18, 1973, petitioner filed an application with the ICC (docket No. 58559 (later consolidated with docket No. 58582)) seeking certain amendments to the priority rules governing its sales of gas, by which it proposed to curtail or discontinue and to limit increases in certain existing services. The requested changes included the reduction or termination of interruptible gas service contracts during the periods of insufficient gas supply in order to facilitate the extension of service to new residential customers. Petitioner's interruptible gas service customers intervened in the proceeding and objected to the proposed revisions. On January 30, 1974, while that proceeding was pending, the ICC instituted a proceeding on its own motion (docket No. 58818), for the purpose of establishing guidelines for all gas utilities in Illinois governing the filing of rules and regulations with respect to the curtailment of gas service during periods of insufficient supply. Accordingly, on August 14, 1974, the ICC issued an order disposing of docket Nos. 58559 and 58582 and providing in pertinent part as follows:

IT IS FURTHER ORDERED that Petitioner inform each of its interruptible customers that it has 20 days to accept an offer to convert to a limited firm service if it so desires and such notice shall be given on the date of the filing of the new tariff sheets herein ordered to be filed.

IT IS FURTHER ORDERED that Petitioner shall, within ten (10) days from the entry of this order, file new tariff sheets limiting annual sales to large firm customers as set forth in Finding (11).

The ICC order entered in docket Nos. 58559 and 58582 also directed petitioner to establish a new limited firm service rate referred to as Service Classification 79 (SC 79), as an option to interruptible gas service customers. This new classification provided for a rate substantially higher than that for inter-

ruptible gas service which would, moreover, continue to escalate over the next 3 years. It guaranteed a level of gas service equal to that received during the 12-month period ending June 30, 1974. The new rate became effective August 22, 1974. Of petitioner's 97 interruptible gas service customers, 87 elected to change to SC 79.

On March 15, 1974, petitioner filed an application (docket No. 58907) with the ICC seeking a general rate increase together with certain changes in the rules, regulations, and conditions applicable to its gas and electric service. Implementation of the new rates proposed by petitioner was suspended through February 13, 1975, by interim orders of the ICC. Various intervenors in docket No. 58907 noted that petitioner was collecting substantial additional revenues from its SC 79 customers. However, the principal purpose of that new rate classification had been to induce such customers to convert to an alternative fuel (other than gas), rather than to produce additional gas revenues. Thus, the level of future collections from SC 79 customers was speculative.

By order dated February 13, 1975, the ICC concluded that revenues collected from SC 79 customers in excess of interruptible gas rates should inure to the benefit of petitioner's firm gas service customers. Accordingly, the ICC ordered that such excess revenues be applied as follows:

(1) That portion needed to maintain the rate of return authorized by the ICC was to be retained by petitioner.

(2) Remaining SC 79 revenues, over and above the amount needed to maintain existing residential rates, were to be credited (referred to in the order as "refunded"), as a per therm adjustment on the bills of petitioner's nonresidential firm customers, subject to certain limitations expressed in the order. Such customers were in service classifications other than SC 79, and were not the same customers who paid the SC 79 revenues.

(3) Any further excess SC 79 revenues remaining were to be accumulated in a special fund, on a quarterly basis, and reported to the ICC for such disposition as a refund to all firm customers or as the ICC may otherwise direct.

Subsequent to the entry of the February 13, 1975, order, it was discovered that a sentence had been omitted from one of

the paragraphs. On February 26, 1975, an order was issued amending such paragraph to read as follows:

Excess revenues generated by Rate 79, over and above that retained by Respondent to maintain an 8.56% rate of return, and that portion refunded to the firm non-residential customers, shall be accumulated by the Company in a special fund, on a quarterly basis, and reported to the Commission for such disposition as a refund to all firm customers or as the Commission may otherwise direct. Said return should be applied to the rate base established hereinafter, but *consideration may be given to subsequent changes in operating revenues and expenses which will occur in the future.* [Emphasis supplied.]

In 1975, revenues were received from SC 79 customers in the total amount of $25,046,902, of which $2,019,127 was in excess of the amount needed to provide the rate of return then authorized by the ICC. Of this excess amount, $880,529 was credited to firm nonresidential customers during 1975. The remainder (Rider R income), in the amount of $1,138,598, was retained by petitioner pending further order of the ICC.

In 1976, revenues were received from SC 79 customers in the total amount of $33,466,376, of which $4,097,245 was in excess of the amount needed to provide the rate of return authorized by the ICC. Of this excess amount, $3,414,399 was credited to firm nonresidential customers during 1976. The remainder, in the amount of $682,846, was retained by petitioner pending further order of the ICC. The foregoing 1975 and 1976 Rider R income items, in the respective amounts of $1,138,598 and $682,846, were commingled with other funds in Illinois Power's general bank accounts and were available for use for its general corporate purposes. Such amounts were not physically segregated from petitioner's general corporate funds or made the subject of any separate escrow or other account. Petitioner was merely required to keep bookkeeping entries establishing the amounts of such retained revenues.

On March 14, 1975, petitioner filed a proposed plan with the ICC (docket No. 59733) to achieve common residential gas rates throughout its service territory. On February 11, 1976, the ICC issued its order in docket No. 59733, which provided, inter alia, for a consolidation of residential rates. It was anticipated that this consolidation would result in a loss of revenue to petitioner, of which fact cognizance was taken by the following reference to revenues from SC 79 customers:

The Commissioner is aware that * * * consolidating residential rates will cause a revenue loss to Illinois Power from residential service. The Commission is also aware that Rate 79 has and may continue to produce substantial additional revenue for Illinois Power above that required to satisfy the 8.56% rate of return condition of our order in Docket No. 58907. This Commission is of the opinion that Illinois Power *should be authorized to use these excess funds* to offset the temporary loss of revenue imposed by the consolidation specified herein prior to making additional refunds to the non-residential classification or accumulating further excess funds. [Emphasis supplied.]

Under date of July 23, 1976, petitioner filed an application with the ICC (docket No. 76–0435), seeking certain changes in the rules, regulations, and conditions applicable to its gas and electric service, and further seeking "changes in the provisions of Rider R, * * *, which would permit it to retain a larger amount of the revenues collected from its limited firm [SC 79] gas sales." Petitioner's application included the following statement:

### RIDER R

*Rider R* (Adjustment for Refunds to Non-Residential Firm Customers) has been revised to *change the rate of return* from the existing 8.56% to a proposed 9.85% rate of return on the gas utility rate base. *The* gas utility *rate base* designated "B" *in the existing and proposed rider is modified* to incorporate the most recent gas utility rate base determination available for the year ending the month preceding the month during which a calculation is made. This change is intended to substitute a current gas utility rate base determination in place of the historic rate base for the twelve month period ended June 30, 1974, which is utilized in the present Rider R. [Emphasis supplied.]

On June 15, 1977, the ICC issued its order in docket No. 76–0435, which states in part as follows:

*Proposed Changes in Gas Rate Schedules*

Respondent proposes to modify its gas tariffs by increasing the allowed rate of return from 8.56% to 9.85% and by updating the rate base from $195,117,000 authorized in its last rate case to a current rate base. Respondent proposes to *determine a new rate base quarterly*, each time a filing is made under the provisions of Rider R.

\*  \*  \*  \*  \*  \*  \*

The Commission's purpose for establishing Rate 79 (stated in the order in Consolidated Docket Nos. 58559 and 58582) was to allow those customers

who had no choice to remain on gas but primarily to ultimately make gas service available to the small user.

The Commission is of the opinion that the rate should be continued to be increased until it ultimately does become higher than alternative fuels. The rate should be increased at a pace that enables Illinois Power to dispose of the gas which becomes available to firm customers. Rate 79 charges should continue to be increased in amounts that will make Rate 79 10% higher than No. 2 fuel oil after five years.

    *      *      *      *      *      *      *

Respondent proposes to maintain a current rate base in calculating excess revenues in accordance with Rider R. The Commission is of the opinion that the rate base used for such purposes should be approved by this Commission and only after audit and review as performed during a rate case. To allow Respondent to determine its own rate base and then use that rate base to calculate any excess revenues would be inconsistent with the statutory responsibility envisaged by this Commission. Respondent should be allowed to establish a new rate base consistent with the provisions of this order but should not be permitted to increase said rate base above the amount established herein without further order of the Commission.

### Disposition of the Special Fund

*Respondent proposed the disposition of the special fund of $1,821,000 by retaining it* to earn its proposed rate of return. Respondent has also proposed disposition of the fund in Docket No. 58907 Supp. The Commission is of the opinion that the special fund should be disposed of in Docket No. 58907 Supp. The temporary handling of the special fund for the purposes of this proceeding is determined herein. *If and when Respondent disposes of the special fund* it may petition this Commission for specific rate base adjustment to Rider R.

[Emphasis supplied.]

On January 9, 1979, petitioner filed an application with the ICC (docket No. 79–0071) seeking certain rate increases, service classification changes, and a further change in the method of computing the application of excess revenues from SC 79 customers. The latter proposal was expressed as follows:

### Revisions to Rider R

The Company proposes a new Rider R under which excess revenues will be determined as revenues received from Service Classification 79 customers less the revenues which would have been received for the same consumption had these customers been billed at the rates proposed in Service Classification 75. Estimated excess revenues, forecasted each November for the upcoming calendar year and adjusted for any over or under-refund during

874

the preceding twelve months, will be refunded on a levelized monthly basis during the upcoming year as a credit to the facilities charges under Service Classifications 51, 55 and 63. In addition, the balance in the "Special Fund" will be refunded as a $0.50 per month credit against the facilities charges due under Service Classifications 51, 55 and 63, until exhausted. Until such time as the facilities charge under Service Classification 51 or the "Special Fund" is exhausted, the Company will recover the difference in the facilities charge from the "Special Fund". After the "Special Fund" is exhausted, the Company will recover any difference between these facilities charges from Service Classification 79 excess revenues.

By order dated November 28, 1979, in docket No. 79–0071, the ICC provided for the disposition of the remaining balance of excess SC 79 revenues still held by petitioner in the amount of $4,095,761, as follows:

The Commission, after reviewing the entire record, is of the opinion that the deferred Rider R balance of $4,095,761 should accrue interest at an annual rate equal to the rate of return allowed herein for gas operations computed monthly on the unrefunded balance of the deferred Rider R special fund, commencing with interest computed on the date of this Order. The Commission is of the opinion that the special fund, including interest as specified, should be refunded by deducting equal amounts each month for 12 months from each bill issued under Service Classifications 51 and 63. The Special Fund should no longer be deducted from rate base for ratemaking purposes.

Under date of January 9, 1981, petitioner filed an application with the ICC, seeking to cancel SC 79 and the Rider R income account, since it no longer had any SC 79 customers. This application summarizes the history of SC 79 and the excess revenues derived therefrom in the following language:

The purpose of this filing is to cancel Service Classification 79 - Limited Firm Gas Service, and Rider R - Adjustment to Residential and General Gas Service Charges.

Service Classification 79 was initiated on August 22, 1974 by order of the Illinois Commerce Commission in Docket Nos. 58582 and 58559 Consolidated for the purpose of allowing former interruptible customers to receive a continuing supply of gas service, but at increasingly higher prices intended to encourage such customers to find alternate fuel supplies. * * * Since under the terms of this tariff, no additional customers may be served, Illinois Power Company proposes to cancel Service Classification 79 by this filing.

Rider R - Adjustment to Residential and General Gas Service Charges, was initiated on February 26, 1975, by order of the Illinois Commerce Commission in Docket No. 58907 entered February 13, 1975, as a mechanism to refund on a quarterly basis Service Classification 79 revenues that were in excess of those granted to interruptible gas service customers in Docket No.

58907 to firm non-residential gas customers on a per therm basis. Since the refund was limited to the average increase granted such customers in that docket, a special fund was established for excess revenues over and above the amount refundable to firm non-residential customers.

Effective on November 29, 1979, as provided in the Commission's order in Docket No. 79–0071, Rider R was revised to refund excess Service Classification 79 revenues as a Facilities Charge Refund to residential and general service gas customers on an annual basis using forecasted sales and revenues for the subsequent calendar year adjusted for the difference between estimated and actual sales for the previous twelve month period. In addition, the Commission directed the Company to refund the balance in the special fund established under the superseded Rider R with interest to residential and general service customers over a twelve month period.

On July 28, 1980, the Commission permitted the Company to revise Rider R so that the amount of the Rider R refund could be adjusted in the event the Rider R refund was expected to exceed the balance in the Special Fund and the excess revenues from Service Classification 79 customers. Since the sales to Limited Firm Gas Service customers used for determining the Facilities Charge Refund were considerably below the level forecasted for 1980, it was necessary to terminate the Rider R refund on that date.

As of December 31, 1980, the net balance in the Special Fund and the deferred Rider R Liability Account is ($718,999.06). This balance indicates that Illinois Power Company has over-refunded actual excess revenues by approximately $719,000 including interest at that date.

Since the final sales under Service Classification 79 occurred during the billing month of November, 1980, there will be no future excess Rider R revenues to offset the amount of over-refund. In lieu of recovering this over-refund by a negative refund or a surcharge through the Facilities Charge Refund, Illinois Power Company, by this filing, proposes to cancel Rider R and to offset the over-refund of $718,999.06 against a pipeline supplier refund initiated on September 1, 1980 under Rider A (Purchased Gas Adjustment). The balance in the September 1, 1980 refund account is more than $1,500,000 at December 31, 1980.

We believe that this is a matter that may be acted upon without a formal evidentiary hearing. Illinois Power Company will supply any additional information or data necessary for the Commission's Staff to complete its review of this matter.

All amounts received by petitioner in 1975 and 1976 from SC 79 customers were for gas or related services furnished or delivered. Such customers were liable for the payment of all such amounts, and petitioner had a right to demand and receive them from the payors. A part of the total revenues received from SC 79 customers in each of the years 1975 and 1976 was in excess of the amounts which the ICC believed necessary to provide petitioner with a reasonable rate of return. A portion of such excess was, pursuant to ICC order,

credited in each respective year to nonresidential firm customers in certain service classifications other than SC 79, and is not here in controversy.

The remainder of such excess revenues (the Rider R income amounts) remained in petitioner's possession at the end of each respective taxable year of receipt. These amounts in 1975 and 1976 totaled $1,138,598 and $682,846, respectively. At all times here pertinent, Rider R income was commingled in petitioner's general bank accounts and available for use for its general corporate purposes. Ultimate application of amounts equal to Rider R income remained subject to ICC jurisdiction, and the ICC at various times issued orders affecting such application. Credits of Rider R income, although sometimes referred to as "refunds" by the ICC, were not made to the same customers or class of customers who paid such amounts.

In the notice of deficiency dated July 18, 1979, respondent determined that petitioner received additional taxable income from Rider R of $1,138,598 and $682,846 in its 1975 and 1976 taxable years, respectively.

OPINION

Simply stated, the primary issue for our consideration in this case is whether unit 3 of the Baldwin Power Station was *constructed by* or *acquired by* petitioner Illinois Power for purposes of computing the section 38[9] investment tax credit.

Section 38 allows a credit against income tax otherwise imposed for qualified investment in certain depreciable property. Section 301(a) of the Tax Reduction Act of 1975 (Pub. L. 94–12, 89 Stat. 36) which became effective on March 29, 1975, increased the investment tax credit available to public utilities from 4 to 10 percent for property *acquired* and placed in service after January 21, 1975, and prior to January 1, 1977.

---

[9]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

Sec. 38 provides in its entirety as follows:

SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

Subpart B consists of secs. 46 through 50.

Sec. 46(a)(1).[10] For property *constructed* by the taxpayer, however, the increased credit was available only for that portion of the depreciable asset constructed after January 21, 1975, and before January 1, 1977. These provisional rules of section 46(a)(1)(D) provided in pertinent part as follows:

> (D) TRANSITIONAL RULES.—[The 10-percent credit] * * * shall apply only to—
>
> (i) property * * * the construction, reconstruction, or erection of which is completed by the taxpayer after January 21, 1975, but only to the extent of the basis thereof, attributable to the construction, reconstruction, or erection after January 21, 1975, and before January 1, 1977,
>
> (ii) property * * * acquired by the taxpayer after January 21, 1975, and before January 1, 1977, and placed in service by the taxpayer before January 1, 1977 * * *

The construction of unit 3 of the Baldwin Power Station began in 1971. Unit 3 was completed and placed in service on June 20, 1975, at a total cost of approximately $127,309,500. The cost basis of unit 3 as of December 31, 1975, was approximately $110 million. Petitioner contends that it *acquired* unit 3 within the period specified in section 46(a)(1)(D)(ii) and, accordingly, is entitled to the 10-percent investment tax credit for its entire cost basis in unit 3. Respondent argues that Illinois Power *constructed* unit 3 and, therefore, is allowed the 10-percent credit only for that portion of the basis attributable to construction after January 21, 1975. Sec. 46(a)(1)(D)(i). For the portion of the basis attributable to construction prior to that date, respondent allowed the 4-percent credit.[11]

The investment tax credit provisions were first added to the Code by the Revenue Act of 1962 (Pub. L. 87–834, 76 Stat. 960).

---

[10]Prior to amendment, sec. 46(a)(1) provided as follows:

(1) GENERAL RULE.—The amount of the credit allowed by section 38 for the taxable year shall be equal to 7 percent of the qualified investment (as defined in subsection (c)).

Prior to amendment by sec. 301(b)(1) of the Tax Reduction Act of 1975 (Pub. L. 94–12, 89 Stat. 36), sec. 46(c)(3)(A) read as follows:

(A) In the case of section 38 property which is public utility property, the amount of the qualified investment shall be 4/7 of the amount determined under paragraph (1).

[11]There is no question but that unit 3 was constructed by someone. It is petitioner's position, however, that it was constructed *by* Baldwin Associates *for* Illinois Power and thus was acquired by it within the meaning of sec. 46(a)(1)(D)(ii) and sec. 1.48–2(b)(1), Income Tax Regs. See *Lykes Bros. Steamship Co. v. United States*, 206 Ct. Cl. 354, 368, 513 F.2d 1342, 1349 (1975).

By the addition of section 48(b), the credit was limited to "new section 38 property" defined as follows:

SEC. 48 (b). NEW SECTION 38 PROPERTY.—For purposes of this subpart, the term "new section 38 property" means section 38 property—

(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or

(2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.

In applying section 46(c)(1)(A) in the case of property described in paragraph (1), there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961.

The investment tax credit was terminated by the enactment of section 49(a) of the Tax Reform Act of 1969 for property which was acquired or whose physical construction, reconstruction, or erection was begun after April 18, 1969 (Pub. L. 91–172, 83 Stat. 487, 660). In 1971, however, the investment tax credit was restored by the Revenue Act of 1971 (Pub. L. 92–178, 85 Stat. 497) and the addition to the Code of section 50 which provides in relevant part:

SEC. 50. RESTORATION OF CREDIT.

(a) GENERAL RULE.—Section 49(a) (relating to termination of credit) shall not apply to property—

(1) the construction, reconstruction, or erection of which—

(A) is completed by the taxpayer after August 15, 1971, or

(B) is begun by the taxpayer after March 31, 1971, or

(2) which is acquired by the taxpayer—

(A) after August 15, 1971, or

(B) after March 31, 1971, and before August 16, 1971, pursuant to an order which the taxpayer establishes was placed after March 31, 1971.

(b) TRANSITIONAL RULE.—In applying section 46(c)(1)(A) [defining "qualified investment"] in the case of property described in subsection (a)(1)(A) the construction, reconstruction, or erection of which is begun before April 1, 1971, there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after August 15, 1971.

Section 1.48–2(b), Income Tax Regs., which has remained unchanged and in effect since May 7, 1964,[12] provides special

---

[12]Sec. 1.48–2, Income Tax Regs., was promulgated in 1964 (T.D. 6731, 1964–1 C.B. (Part 1) 11) to interpret sec. 48(b) of the Code, which provides for the initial phasing in of the investment tax credit in 1962. However, a cross-reference to that definitional section is provided by sec. 1.46–1(g) (4), Income Tax Regs., as follows:

rules for determining date of acquisition, original use and basis attributable to construction, reconstruction or erection of section 38 property, including the following relevant definitions:

(b) * * *
(1) Property is considered as constructed, reconstructed, or erected by the taxpayer if the work is done for him in accordance with his specifications.

\*        \*        \*        \*        \*        \*        \*

(5) Construction, reconstruction, or erection by the taxpayer begins when physical work is started on such construction, reconstruction, or erection.
(6) Property shall be deemed to be acquired when reduced to physical possession, or control.

The essence of the parties' disagreement herein concerns the interpretation of section 1.48–2(b)(1) of the Commissioner's regulations. Illinois Power contends that it "acquired" unit 3 of the Baldwin Power Station within the meaning of section 46(a)(1)(D) and the corresponding regulation. To the contrary, respondent argues that unit 3 was "constructed by" Illinois Power because the work was done for it "in accordance with [its] specifications." This issue has been the subject of refund litigation in four prior cases.[13] Accordingly, an examination of the respective analyses of these cases is appropriate.

In *Public Service Co. of New Mexico v. United States*, 431 F.2d 980 (10th Cir. 1970), the taxpayer sued for a refund of taxes assessed and paid for its 1962 taxable year. Public Service claimed an investment credit on "new section 38 property" for its entire cost basis in its new electrical supply station under section 48(b), the first enactment of the investment tax credit. The Government disallowed the credit on the basis that the taxpayer itself had constructed and equipped the powerplant and thus was limited to an investment tax

---

(4) *Cross reference.* (i) The principles of sec. 1.48–2(b) and (c) apply in determining the portion of basis attributable to construction, reconstruction, or erection after January 21, 1975, and in determining the time when property is acquired.

T.D. 7751, 1981–1 C.B. 10.

[13]*Public Service Co. of New Mexico v. United States*, 431 F.2d 980 (10th Cir. 1970); *Lykes Bros. Steamship Co. v. United States, supra; Pacific Far East Line, Inc. v. United States*, 206 Ct. Cl. 378, 513 F.2d 1355 (1975); *Hawaiian Independent Refinery, Inc. v. United States*, 697 F.2d 1063 (Fed. Cir. 1983). See also *Kansas City Southern Railway Co. v. Commissioner*, 76 T.C. 1067, 1122 (1981); *Fort Howard Paper Co. v. Commissioner*, T.C. Memo. 1977–422.

credit only on the portion of the costs incurred after December 31, 1961. Sec. 48(b).

Public Service entered into an agreement with Stearns-Rogers Manufacturing Co. for the construction of the power-plant in January 1960. The agreement was a cost-plus contract for which the construction company was to be paid a fixed fee of $400,000 in addition to its costs. The trial court concluded that Public Service did not have physical possession and control of the plant site and component parts until the power-plant became operational in mid-1962. Therefore, the taxpayer "acquired" the plant after December 31, 1961, within the meaning of section 48(b)(2). It was significant to the trial court's conclusion that the taxpayer's contract with Stearns-Rogers contained a statement to the effect that Stearns-Rogers "will furnish the necessary engineering and construction facilities to turn over to [Public Service] a complete operating unit." 431 F.2d at 982.

In affirming the lower court's decision, the Tenth Circuit stated that "right of control" is the determining factor. The court further added in dicta that "It is apparent that the purpose of [sec. 1.48–2(b)(1) of the regulations] is to distinguish between work done by independent contractors and mere employees" and that the regulation would defeat the investment credit if the term "specifications" were held to refer to the "control and supervision which every owner has the right to exercise over the general work." 431 F.2d at 983.

In holding that the power station was acquired rather than constructed, the court found it significant that the construction superintendent was a Stearns-Rogers employee who took orders only from his employer and that the taxpayer had only one employee on the jobsite and his duties were limited to those of an inspector. The court summarized the crucial facts as follows:

> In sum, Stearns-Rogers [the contractor] controlled the construction of the facility from the original excavation work until it was turned over to the taxpayer. The former received, stored, took possession of and was responsible for the incoming component parts and equipment and decided how, when and by whom it would be erected. And when the final hookups were completed, they tagged the equipment which forbade anyone to handle it except their start-up crew.
>
> * * * Stearns-Rogers was an independent contractor who followed taxpayer's specifications as to results desired, but who independently designed,

engineered, constructed and turned over to Public Service Company a complete operating power station. [431 F.2d at 984.]

Because the plant was not ready to be tested until after the operative date, December 31, 1961, the court found that Public Service did not gain actual physical control of the plant until 1962. Accordingly, the Tenth Circuit held that the plant was "acquired" after December 31, 1961, within the meaning of section 48(b)(2).

The next two cases to examine this issue were companion cases decided by the U.S. Court of Claims (now the Court of Appeals for the Federal Circuit), *Lykes Bros. Steamship Co. v. United States*, 206 Ct. Cl. 354, 513 F.2d 1342 (1975), and *Pacific Far East Line, Inc. v. United States*, 206 Ct. Cl. 378, 513 F.2d 1355 (1975). In *Lykes Bros.*, the taxpayer contracted with Bethlehem Steel Co. for the construction of four ships. The Federal Government subsidized the building of the ships and, in exchange, exercised substantial control over their construction. The contracts for the construction of the ships were three-party arrangements among the Federal Maritime Board (representing the United States), the taxpayer, and Bethlehem Steel. The detailed design, engineering, and construction work was left to Bethlehem Steel employees, and the vessels remained in the physical possession of the contractor throughout the construction process. During that period, the taxpayer had no right to control or make any use of the vessels. Even after the construction was completed the ships were required to pass dock and sea trials conducted by the Maritime Administration Trial and Guarantee Survey Board before they could be delivered. The four ships were finally delivered and made available to the taxpayer for use in its business during 1962.

As in *Public Service*, the Government argued in *Lykes Bros.* that the taxpayer constructed the vessels within the meaning of section 48(b)(1) and section 1.48–2(b)(1), Income Tax Regs., because the construction was done for it "in accordance with [its] specifications." The Government contended that the regulation was intended to distinguish between "custom built" items and "off the shelf" items and that all items in the former category are to be treated as constructed "by the taxpayer." Although the court concluded that the ships were acquired by the taxpayer, the same result as that reached in *Public*

*Service*, it adopted a modification of the test used by the Tenth Circuit. The court stated that while it agreed that "the right of control" is the determining factor in differentiating between property constructed *for* the taxpayer and property constructed *by* the taxpayer, "we need not go so far as to hold that the taxpayer is entitled to recover upon a finding, without more, that the Bethlehem Steel Company filled the role of an independent contractor in the construction of the Lykes Bros. ships." 206 Ct. Cl. at 371, 513 F.2d at 1351.[14]

In *Lykes Bros.*, the court found that the determining factor was not that the vessels were constructed by an independent contractor but rather that there were three contracting parties and that the Government had the right to control the design specifications and other aspects of the contract from the initiation of the project until the completion and delivery of the vessels.[15] The court observed:

> The regulation implies that the taxpayer must have control over the project before it will be considered to be constructed, reconstructed, or erected by him, but the scope of the term "specifications" is unclear. General or limited control over the contract plans and specifications is, in and of itself, insufficient to establish the degree of control necessary to find that the property was constructed "by the taxpayer." If plaintiff has such control over the details of the work that it is the maker of the property, or constructs the property itself, then there is a sufficient nexus between the construction and the taxpayer for the construction to be "by the taxpayer" within the meaning of section 48(b)(1). [206 Ct. Cl. at 369–370, 513 F.2d at 1350.]

After analyzing all the facts, the court concluded that "the balance tilts in favor of a conclusion that the vessels were not constructed 'by the taxpayer' within the meaning of section 48(b)(1) or 'in accordance with [its] specifications,' as that phrase in the regulations should be interpreted." 206 Ct. Cl. at 374, 513 F.2d at 1352.

In *Pacific Far East Line, Inc. v. United States*, 206 Ct. Cl. 378, 513 F.2d 1355 (1975), decided the same day as *Lykes Bros.*, the court was presented with the identical issue and similar facts. In again concluding that the taxpayer had "acquired"

---

[14]The court noted that Bethlehem Steel was, in fact, an independent contractor in relation to the other contracting parties in that it was required to furnish all labor and materials, to perform all the work, and to deliver the ships at its own risk.

[15]The court also found it significant that the ships were not built on the taxpayer's property but rather were constructed at Bethlehem Steel's shipyard. *Lykes Bros. Steamship Co. v. United States*, 206 Ct. Cl. at 373, 513 F.2d at 1352.

rather than "constructed" the two vessels in question, the court noted that the taxpayer did not have the right to exercise a sufficient degree of control over the construction to come within the provisions of section 48(b)(1) and, in fact, its role in the construction process was primarily a passive one.[16] The court stated:

> As we held in *Lykes Bros. Steamship Co.*, property is constructed "by the taxpayer" under section 48(b)(1) only if we find that the taxpayer possesses the right to control the details of the construction process. * * * In this case, plaintiff has shown, even more conclusively than was done by the taxpayer in *Lykes Bros. Steamship Co.*, that plaintiff did not have the right to exercise and did not in fact maintain the degree of control necessary to place the construction of the property within the provisions of section 48(b)(1). [206 Ct. Cl. at 383–384, 513 F.2d at 1358.]

The most recent case to address this issue is *Hawaiian Independent Refinery, Inc. v. United States*, 697 F.2d 1063 (Fed. Cir. 1983). In this case, Hawaiian Independent Refinery, Inc. (HIRI), claimed an investment tax credit with respect to an oil refinery complex consisting of the refinery itself, an offshore tanker-mooring facility, and pipelines to storage facilities. HIRI argued that it acquired the refinery complex after August 15, 1971, under a turnkey contract and that, therefore, the entire cost basis qualified for the investment tax credit under section 50(a)(2)(A).[17]

In 1968, HIRI selected the site, obtained a lease of the property, and hired a consultant, Foster Wheeler, for preparing preliminary studies on the engineering and economics of the refinery. Because HIRI did not have the necessary personnel, it also retained three engineering firms to serve as design engineers and construction supervisors. HIRI also arranged for soil tests, a foundation study, and the clearing and grading of the refinery site. In addition, HIRI hired a retired oil refinery operator to oversee the design and construction of the entire facility as well as two project engineers.

---

[16]The court found that the Government played a larger role in designing the vessels than in *Lykes Bros. Steamship Co. v. United States, supra*, and that *Pacific Far East Line, Inc. v. United States, supra*, merely requested certain minor modifications in design so that the completed vessel would more nearly meet its commercial needs.

[17]Sec. 101(a) of the Revenue Act of 1971 (Pub. L. 92–178, 85 Stat. 498), which added sec. 50 to the Code, restored the investment tax credit which had been repealed by the Tax Reform Act of 1969 (sec. 703(a) of Pub. L. 91–172, 83 Stat. 487, 660).

HIRI argued that the phrase "constructed * * * by the taxpayer" contained in section 1.48–2(b)(1), Income Tax Regs., requires "control over the details of the construction" as was stated by the Court of Claims in *Lykes Bros. Steamship Co. v. United States*, 206 Ct. Cl. at 367, 513 F.2d at 1348.[18] The taxpayer also argued that it lacked such control in that it had a turnkey contract with its consultant to build a refinery complex that worked as guaranteed, thus bringing the case within the scope of the rule of *Public Service Co. of New Mexico v. United States*, 431 F.2d 980, 983 (10th Cir. 1970).[19]

The Federal Circuit upheld the trial court's finding that the taxpayer "constructed" rather than "acquired" the refinery complex noting that HIRI's agreement with the consultant was not a turnkey arrangement and that, in addition, the taxpayer interpreted the term "right of control" too narrowly. The court found it significant that: (1) HIRI had the right to request alterations and additions to, and deletions from, the work; (2) HIRI could specify materials or services from suppliers, vendors, or subcontractors other than those selected by Foster Wheeler; (3) Foster Wheeler procured all materials and services as HIRI's agent; (4) HIRI was responsible for approving designs and drawings as required; (5) HIRI's employees visited the refinery worksite several times per week, both to inspect the workmanship and to verify that some of the equipment and apparatus were being installed and erected in accordance with contract plans and specifications; and (5) the parties communicated with each other on an almost daily basis. The court approved the finding of the trial judge that:

"To a significant extent HIRI's employees influenced and affected the content and makeup of the contract plans and specifications," and that "the facility * * * actually constructed was superior to and at a lower cost than that which would have been built had HIRI provided no input." [*Hawaiian Independent Refinery, Inc. v. United States*, 697 F.2d 1063, 1068 (Fed. Cir. 1983). Fn. ref. omitted.]

---

[18]The U.S. Court of Appeals for the Federal Circuit was established on Oct. 1, 1982, by the Federal Courts Improvement Act of 1982, Pub. L. 97–164, 96 Stat. 25. The holdings of its predecessor courts, the U.S. Court of Claims and the U.S. Court of Customs and Patent Appeals, were adopted as binding precedent by the successor court in *South Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982).

[19]We note that the Tenth Circuit in *Public Service Co. of New Mexico v. United States*, 431 F.2d 980 (10th Cir. 1970), did not make a specific finding that a turnkey contract was involved in that case.

Thus, the court concluded, the taxpayer must be held to have constructed the refinery within the meaning of the regulation.

Contrary to the statement by the Tenth Circuit in *Public Service* that the purpose of the regulation was to differentiate between work accomplished by independent contractors and employees, the Federal Circuit in *Hawaiian Independent Refinery* rejected this mechanical test noting that it considered the "clear understanding of Congress" to be that property can be considered as constructed by the taxpayer even if the construction is accomplished pursuant to a contract with an independent contractor. 697 F.2d at 1069. Instead, the court stressed that the operative test was the degree of control over the details of the construction and that the involvement of the taxpayers in *Public Service* as well as in *Lykes Bros.* and *Pacific Far East Line* was passive compared to the active control exercised by HIRI.[20] 697 F.2d at 1067 n. 7.

We turn now to the case at bar. Although the transcript was lengthy, the exhibits voluminous, and the stipulations scanty, few facts are seriously in dispute. Rather, it is over the characterization of those facts that the taxpayer and respondent part company. A summary of the relevant facts is as follows:

On October 19, 1966, Illinois Power was granted a certificate by the ICC authorizing the construction, operation, and maintenance of a multiunit steam electric generating system to be known as the Baldwin Power Station. Petitioner owned, had under option, or acquired by eminent domain title to, or a perpetual easement to, the 3,830 acres of land needed for the power station. Units 1 and 2 were placed into commercial service in 1970 and 1973, respectively. Construction of unit 3 began in 1971, and it was placed in commercial service on June 20, 1975.

The construction of unit 1 included the construction of many facilities which were ultimately utilized in common by all three units such as a 2000-acre cooling lake, a centralized control room, railroad tracks for transporting coal, a circulating water system, and a sewage disposal system. Thus, a

---

[20]We note that the Seventh Circuit Court of Appeals, the court to which an appeal from our decision herein would lie, has not yet addressed this specific issue. See *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Sec. 7482(b)(1)(B).

substantial portion of the total cost of unit 1 was for such common facilities and equipment.

Unit 3 is an extremely complex facility. It is approximately the height of a 24-story building and consists of hundreds of major components including a 10,000-ton boiler. Illinois Power did not have sufficient personnel to construct unit 3 utilizing its own employees. The primary function of petitioner's construction department (consisting of approximately 24 employees) was to oversee and monitor work performed by outside contractors.

Sargent & Lundy is an engineering partnership specializing in the design of steam-generated electrical powerplants. Petitioner has been a client of Sargent & Lundy since 1947. On September 4, 1970, Illinois Power executed an agreement with Sargent & Lundy specifying services to be performed by the latter party in connection with the construction of unit 3.

Sargent & Lundy formulated the overall design concept for unit 3 (which was similar to that used for units 1 and 2). After consultation with Illinois Power, Sargent & Lundy prepared more than 1,600 design drawings, reviewed thousands of drawings prepared by manufacturers of equipment, and prepared approximately 90 specifications with respect to materials, equipment, and supplies engineered specifically for unit 3. These materials and equipment specifications were incorporated into bid packages released to a predetermined list of bidders approved by petitioner. These items were then purchased by petitioner in accordance with contracts executed by petitioner and the successful bidder.

The general procedure for the purchasing of equipment from various manufacturers and suppliers was for Sargent & Lundy to first prepare specifications and forward them to bidders approved by Illinois Power. The bidders submitted their proposals directly to petitioner with copies to Sargent & Lundy. Sargent & Lundy then reviewed the proposals and made recommendations to petitioner who would subsequently inform Sargent & Lundy in writing of its decision to award a contract to a particular manufacturer or supplier. Sargent & Lundy would then prepare a contract for execution by petitioner and the successful bidder. A purchase order would be executed by petitioner simultaneously with the execution of a contract.

Bids for shelf components (standard manufactured products generally costing less than $25,000) were obtained using a short-form or letter specification prepared by Sargent & Lundy. Sargent & Lundy reviewed bids submitted and made recommendations to petitioner. Illinois Power then issued purchase orders to the selected vendors.

If requested, each manufacturer or supplier was required to permit petitioner, itself, to inspect both the materials and fabrication process. Illinois Power also had the right to observe production tests and to require the manufacturer or supplier to make any changes it deemed necessary. Purchase orders were issued and each manufacturer or supplier was paid by petitioner. Legal title to the items was transferred to Illinois Power prior to delivery. Invoicing, shipping, and routing instructions were issued by petitioner directly to the suppliers and manufacturers, and delivery was made directly to the jobsite. A warehouse for the storage of equipment and materials was located at the construction site, and an employee of petitioner maintained an inventory of all items in the warehouse.

Baldwin Associates (a joint venture of four contractors) was organized in 1967 for the specific purpose of constructing unit 1 of the Baldwin Power Station. The joint venture agreement was later amended to include the construction of units 2 and 3 within the scope of the joint venture. Baldwin Associates performed the actual physical construction on all three units including the erection of the superstructures and shells and the installation of the equipment and components. On unit 3, Baldwin Associates also erected the turbine and steam generators.

A contract for the construction of unit 3 was executed between Baldwin Associates and Illinois Power on February 23, 1972. Although the contract was drafted by Sargent & Lundy, it contained certain clauses specifically requested by petitioner and it was approved by petitioner and its counsel prior to submission to Baldwin Associates. Section 9 gives Illinois Power the right to order Baldwin Associates to employ more men or machinery as necessary to complete the work in accordance with the construction schedule. That section also sets forth conditions under which petitioner may terminate

the contract and take possession of the work for the purpose of completing it as deemed expedient.

Petitioner and Sargent & Lundy had the right to inspect and test the work in progress and could reject any work found to be defective or not in accordance with the contract specifications. Petitioner provided insurance against (or assumed the risk of) physical loss or damage caused by fire, vandalism, malicious mischief, weather, explosion, and additional perils normally insured. Petitioner paid $710,000 to Baldwin Associates pursuant to this provision for costs incurred in connection with the repair of a collapsed cofferdam. In addition, Baldwin Associates was not permitted to assign or subcontract any part of its work without Illinois Power's written approval.

Baldwin Associates was required to install or erect certain work such as structural items, mechanical equipment, and electrical work. All such items were owned by Illinois Power at the time of their installation or erection. Baldwin Associates had no input in the selection of any of the suppliers of such equipment, components, or materials. Baldwin Associates purchased construction materials such as steel, concrete, piping, and roofing, but did not purchase any of the major plant equipment or components.

Petitioner was concerned about the timeliness of construction, specifically that unit 3 be commercially operable in time to meet the summer 1975 peak demand for electricity. The construction schedule finally adopted incorporated revisions based upon agreements reached between petitioner and Baldwin Associates.

Illinois Power obtained the services of a testing laboratory to inspect the strength, erection, and connections of the structural steel erected or installed by Baldwin Associates. Baldwin Associates was required to correct defects when and as determined by the laboratory.

On February 23, 1972, an amendment was executed to the contract between petitioner and Baldwin Associates specifying costs included in the fixed fee to Baldwin Associates and those payable directly by Illinois Power. Costs payable directly by petitioner were costs of all labor, supplies, materials, small tools, machinery, and equipment used or incorporated in the work, freight, cartage and transportation charges, subcon-

tracts, and rental charges for items of equipment and machinery.

Petitioner, Sargent & Lundy, and Baldwin Associates held monthly meetings at petitioner's offices to discuss the progress of the construction of unit 3. The purpose of these meetings was to enable the parties to discuss job progress and to apprise Illinois Power of any problems affecting the project. Sargent & Lundy prepared monthly reports for petitioner from November of 1971 through March of 1974. These reports summarized the status of progress on the job, including major equipment purchased since the previous report.

It was petitioner's policy to assign engineers from its construction department, as well as other employees, to monitor the construction and design of new generating units, including unit 3. The responsibilities of these employees were to review the work of Sargent & Lundy, monitor construction activity on unit 3, and review billings and design drawings. In addition to other employees involved with the project, petitioner stationed eight engineers, an accountant, and a storekeeper at the jobsite under the supervision of Mr. Robert J. Canfield, powerplant construction engineer. Mr. Canfield and his staff constantly monitored activities at the site and had significant input into the construction process as detailed in our findings of fact.

Illinois Power also assigned two clerical employees to the unit 3 jobsite to maintain an inventory of all items stored in the warehouse. These employees inspected equipment when delivered and made certain that the necessary paperwork was completed to support the billings.

Although the record does not fully disclose the total checkout time required for unit 3, petitioner estimated that as of April 3, 1974, 8,248 man-hours were required for its engineers to complete the electrical checkout, and 8,802 man-hours were required to complete the control and instrumentation checkout. If petitioner's employees discovered a problem with a piece of equipment, they would frequently deal directly with the manufacturer to resolve it.

In the four cases which have previously examined the issue presented herein, the courts agreed that the *right of control* is the operative factor in determining whether a taxpayer has "constructed" or "acquired" section 38 property. We add our

agreement to the consensus on this point. We believe it is clear from the facts before us that petitioner Illinois Power exercised active and pervasive control over the construction of unit 3 of the Baldwin Power Station. As such, we find and hold that unit 3 was constructed by petitioner within the meaning of section 46(a)(1)(D)(i) in that it was constructed "in accordance with [Illinois Power's] specifications." Sec. 1.48–2(b)(1), Income Tax Regs.

Petitioner seeks to minimize the extent of its involvement by portraying itself as fairly disinterested in the day-to-day progress of the construction. In our view, however, the facts belie such characterization. We find it significant to our conclusion that the taxpayer provided general criteria for unit 3 to its agent, Sargent & Lundy, who prepared design specifications and design drawings. Petitioner purchased all major components with Sargent & Lundy's assistance, approved specifications, accepted delivery of, stored, and safeguarded components and equipment delivered to the jobsite. It also held legal title to all work completed and in progress and bore the risk of damage or loss to the plant and equipment during construction. Further, Illinois Power retained the right to change the scope of work being performed by Baldwin Associates, to order it to employ more craftsmen or equipment, to cease work at any stage, and to prevent hiring of any subcontractor without explicit approval.[21] We believe these facts (along with a multitude of others) demonstrate that petitioner exercised active and significant control over the details of construction on a continuing basis. Thus, the balance tilts heavily toward the conclusion that Illinois Power "constructed" unit 3 as that term is used in the statute.

Petitioner argues that unit 3 of the Baldwin Power Station was constructed by Sargent & Lundy and Baldwin Associates for Illinois Power and, therefore, the plant was "acquired" by it. Although in a limited and literal sense that may be a true statement, we do not believe that the statutory language of section 46(a)(1)(D)(ii) can be so narrowly interpreted. While Illinois Power itself did not construct unit 3 in the sense of using its own employees to do the actual construction, its employees were involved at all stages of the construction

---

[21]As noted in our findings of fact, the total cost of the change orders authorized for Baldwin Associates was approximately $3,500,000.

process, participating on a day-to-day basis in the project. This participation in and control of the construction process make it clear that the property was constructed rather than acquired. Additionally, we believe that Sargent & Lundy was petitioner's agent and that petitioner, through its employees, made the final decisions on all important matters handled by Sargent & Lundy. On calling these shots on a continuing basis, petitioner controlled the project by, with, and through its agent, Sargent & Lundy.

Petitioner argues, however, that the method used is the only method by which a power station of this magnitude and complexity can be built. While we agree with petitioner on this point, it is a non sequitur to conclude therefrom that the power station was acquired. The question is not whether the method was the only one available, but what Congress provided as to the method utilized. Petitioner undoubtedly would have been remiss in its obligations as a public utility had it not exercised a great degree of control and supervision over the plant during the construction process.[22] But we are not dealing here with a statute and regulation that prescribe a particular method of building an asset or that seek to induce public utilities to construct or acquire assets in a particular manner. Rather, we have before us a definitional statute and regulation that seek to categorize assets (after the fact) in terms of whether they were constructed or acquired. For the reasons given, the facts before us preclude a conclusion that the property in issue was "acquired" within the meaning of section 46(a)(1)(D)(ii).

This seems entirely consistent with congressional policy underlying the investment tax credit. Petitioner contacted

---

[22]On this point, we agree with the Tenth Circuit in *Public Service Co. of New Mexico v. United States*, 431 F.2d 980, 983 (10th Cir. 1970), that "It would be patently absurd for a utility company to only generally describe the yet-to-be constructed plant and expect the contractor to fill in all the technical data and performance details." However, we do not agree that the necessary corollary of that statement is that "the purpose of this regulation is to distinguish between work done by independent contractors and mere employees." 431 F.2d at 983. Substantial control can be exercised through independent contractors as is clear from the facts herein, and on this point we agree with the Court of Appeals for the Federal Circuit that it was—

"the clear understanding of Congress that, for purposes of both the investment tax credit and the analogous accelerated depreciation deduction, construction of the property need not be done by the taxpayer's own employees, but can be pursuant to a contract with an independent contractor. H.R.Rep. No. 2087, 89th Cong., 2d Sess. 31 (1966); S.Rep. No. 1724, 89th Cong., 2d Sess. 3, 16–17, 23–25 (1966), U.S. Code Cong. & Admin. News 1966, p. 4327; H.R.Rep. No. 413, 91st Cong., 1st Sess. 229–30 (1969), U.S. Code Cong. & Admin. News 1969, p. 1645. [*Hawaiian Independent Refinery v. United States*, 697 F.2d 1063, 1069 (Fed. Cir. 1983).]"

Sargent & Lundy in 1969 for assistance in designing unit 3 and signed a contract with them in 1970. Construction began in 1971 and was nearly 90-percent completed by the effective date that the credit for public utility property was increased from 4 to 10 percent. The entire facility was placed in service a few months after that date. From the beginning to nearly the end—a period of almost 6 years—petitioner's economic assumptions were predicated on a 4-percent credit. Yet petitioner now claims a 10-percent credit not only on the construction after January 21, 1975, but the approximately $112 million in construction costs incurred before that date. We believe Congress limited the credit for property constructed by the taxpayer to construction after the effective date to avoid precisely this type of windfall.[23]

---

[23]S. Rept. 94–36 (1975), 1975–1 C.B. 590, 596 (Tax Reduction Act of 1975, Pub. L. 94–12), provides in pertinent part as follows:

*"Business Tax Reductions*

*"Increase in the investment credit.*—In view of the low and decreasing level of economic activity and the poor expected level of investment, the committee concluded that a balanced program which encourages both consumption and investment will be a more effective method of stimulating the economy than attempting to focus all of the tax stimulus on consumption. In addition to providing *short-run stimulus to the economy,* an increase in the amount of investment is desirable for other reasons. * * *

"The House bill seeks to respond to these problems by increasing the investment credit for one year (with limited extensions beyond that year) from 7 to 10 percent generally (from 4 percent for public utilities), and by adopting a number of other liberalizations in the credit designed to facilitate the use of the credit and increase the amount of relief provided by the credit. However, the Finance Committee believes that the current economic situation and the low level of investment now prevailing call for stronger remedies than those provided in the House bill. *For this reason, the committee decided to increase the investment credit to 12 percent for 1975 and 1976, the 2 years in which most forecasts indicate the investment stimulus will be particularly needed.* In addition it decided to make the 10-percent investment credit permanent for 1977 and later years. * * *

"[Emphasis added.]"

See also H. Rept. 94–19 (1975), 1975–1 C.B. 569, 574–575 (Tax Reduction Act of 1975, Pub. L. 94–12). The Conference Committee report provides in relevant part as follows:

*"Conference substitute.*—The conference substitute provides for a 10-percent investment credit for all taxpayers (including public utilities) for property acquired and placed in service after January 21, 1975, and before January 1, 1977. In the case of property acquired after December 31, 1976, the 7-percent investment credit (or 4 percent for public utility property) provided under present law is to apply (even if ordered by the taxpayer before 1977). In the case of constructed property, the 10-percent credit is to apply to the portion of the base attributable to construction occurring after January 21, 1975, and before January 1, 1977. [Conf. Rept. 94–120 (1975), 1975–1 C.B. 624, 627.]"

While the Conference Committee substituted a 10-percent credit for all taxpayers during the relevant period, the restriction of the increased credit to the period after Jan. 21, 1975, and before Jan. 1, 1977, indicates that it was the intent of Congress to provide a "short-run stimulus to the economy."

The second and final issue presented for our consideration is whether income received from Rider R sources in the amounts of $1,138,598 and $682,846 is taxable to petitioner in its 1975 and 1976 taxable years, the respective years of receipt.

A shortage of natural gas developed in the early 1970's. As a result, pipeline companies were unable to meet their contractual commitments to supply gas to Illinois Power and were curtailing deliveries. Petitioner proposed increasing service interruptions to interruptible customers in order to deal with the problem. Instead, however, the ICC established a special limited firm service rate referred to as service classification 79, effective August 22, 1974. SC 79 guaranteed a level of gas service equal to that received during the 12-month period ending June 30, 1974, at a rate substantially higher than that for interruptible gas service. The higher rates were intended to encourage such users to switch to alternative fuel sources. Of petitioner's 97 interruptible gas service customers, 87 elected to change to SC 79 service.

The ICC concluded that petitioner would be unjustly enriched if it were allowed to retain the excess revenue collected from SC 79 customers and, instead, those amounts in excess of interruptible rates should inure to the benefit of Illinois Power's firm gas service customers. The ICC issued an order on February 13, 1975, modified by an order on February 26, 1975, dealing with the disposition of such revenues. The order authorized petitioner to retain a portion of the excess revenues from SC 79 to offset the need for a residential rate increase. In addition, Rider R was initiated as a mechanism to refund (i.e., *credit* as a per therm adjustment on the bills of petitioner's nonresidential firm customers) a portion of those remaining excess funds collected from SC 79 customers. Because the "refund" was limited to the average increase granted such customers, a special fund was established for those revenues over and above the amount refundable to firm nonresidential customers. These remaining revenues were to be reported to the ICC for disposition as directed.

In 1975, a total of $25,046,902 was received from SC 79 customers, of which $2,019,127 was in excess of the amount needed to provide the authorized rate of return. Of this excess amount, $880,529 was credited to firm nonresidental custom-

ers during 1975, and the remaining $1,138,598 was retained pending further order of the ICC.

In 1976, a total of $33,466,376 was received from SC 79 customers, of which $4,097,245 was in excess of the amount needed to provide the authorized rate of return. Of this excess amount, $3,414,399 was credited to firm nonresidential customers during 1976, and the remaining $682,846 was retained pending further order of the ICC.

All amounts received by petitioner in 1975 and 1976 from SC 79 customers were for gas or related services furnished or delivered. Such customers were liable for the payment of all such amounts and petitioner had the right to demand such payment.

These Rider R income items in the amounts of $1,138,598 in 1975 and $682,846 in 1976 were commingled with petitioner's other funds in its general bank accounts and were available for use for its general corporate purposes. These amounts were not physically segregated from its other funds or made the subject of any separate escrow or other account. Illinois Power was merely required to keep bookkeeping entries recording the amounts of such retained revenues. These amounts remained in petitioner's possession at the end of each respective taxable year of receipt.

In late 1979, the ICC directed petitioner to "credit" all such Rider R amounts in the special fund to residential and general service customers (i.e., not the same customers or class of customers who paid such amounts) through a monthly credit against the customer's facilities charge. These credits commenced in late 1979 and were completed in 1980.

The law is clear that all gains are includable in gross income, except those specifically exempted. Sec. 61. Sec. 1.61–1(a), Income Tax Regs.; *James v. United States*, 366 U.S. 213, 218–219 (1961); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955). Under the "claim of right doctrine" established by the Supreme Court, earnings received by a taxpayer under a claim of right and without restriction as to its disposition are income in the year of receipt even though the taxpayer is not entitled to retain the money and may be required to restore its equivalent. *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932). "Although this doctrine has been applied 'in a variety of contexts,'" we stated in

*Nordberg v. Commissioner*, 79 T.C. 655, 664 (1982), affd. without published opinion 720 F.2d 658 (1st Cir. 1983), "the situations have shared 'a common factual element: the receipt of money or other property by a taxpayer with an imperfect right to retain it.' Wootton, 'The Claim of Right Doctrine and Section 1341,' 34 Tax Law. 297 (1981)." Petitioner seeks to avoid the application of this doctrine by arguing that the Rider R funds at issue here do not constitute taxable income in the year of receipt because there were substantial restrictions upon the disposition of such funds and, as such, the amounts were not received under a claim of right.

This Court has stated that the "mere fact that income received by a taxpayer may have to be returned at some later time does not deprive it of its character as taxable income when received." *Woolard v. Commissioner*, 47 T.C. 274, 279 (1966). The claim of right doctrine applies even though the taxpayer may have a "contingent obligation to restore the funds at some future point." *Professional Insurance Agents v. Commissioner*, 78 T.C. 246, 270 (1982), affd. 726 F.2d 1097 (6th Cir. 1984). As we have recently noted "To avoid the application of the claim of right doctrine, the recipient must at least recognize in the year of receipt 'an existing and *fixed* obligation to repay the amount received' and '*make provisions* for repayment.' " *Nordberg v. Commissioner, supra* at 665, quoting *Hope v. Commissioner*, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir. 1973). (Emphasis added in *Nordberg*.)

We are convinced that the claim of right doctrine applies under the instant facts. Illinois Power received the amounts in controversy as payment for gas supplied to SC 79 customers.[24] Such amounts were received and commingled with its other funds and were available for its general corporate purposes. The only "condition" attached to such funds was that Illinois Power was required to make bookkeeping entries recording the amounts of such funds and report the totals to the ICC pending its further order.

---

[24]The law is clear that even an advance payment for goods or services to be provided in the future which is available for general business purposes is taxable in the year of receipt. *Schlude v. Commissioner*, 372 U.S. 128 (1963); *Hagen Advertising Displays, Inc. v. Commissioner*, 407 F.2d 1105 (6th Cir. 1969), affg. 47 T.C. 139 (1966); *United States v. Williams*, 395 F.2d 508, 510 (5th Cir. 1968); *BJR Corp. v. Commissioner*, 67 T.C. 111 (1976). See also *City Gas Co. of Florida v. Commissioner*, T.C. Memo. 1984–44.

Subsequently, in 1979, these amounts were credited in favor of other customers' accounts. The funds never left the possession of the petitioner. In effect, at the direction of the ICC, petitioner's rates for SC 79 customers were higher than the normal rate in 1975 and 1976, and in later tax years other customers were charged a lower than normal rate. Although the term "refund" was used in the ICC's order, the term was used loosely, for there was no actual rebate of funds to the customers. Rather, certain customers were, in effect, charged less for gas at a later date. Petitioner does not suggest, nor is there any indication in the record that the funds were a deposit or a loan. Additionally, we are unable to find that there was an existing and fixed obligation to repay the amounts received or that any provision was made for repayment. See *Nordberg v. Commissioner, supra.*

Petitioner relies on the case of *Mutual Telephone Co. v. United States*, 204 F.2d 160 (9th Cir. 1953), revg. 100 F. Supp. 164 (D. Haw. 1951), as being indistinguishable from the facts before us. In that case, the local regulatory commission determined that certain additional telephone connection charges collected from new customers solely to discourage the demand for new installations were in excess of amounts economically justified. Accordingly, the commission ordered the excess amounts to be reflected and segregated in an existing account, referred to as "contributions to telephone plant."

The Court of Appeals for the Ninth Circuit concluded that definite limitations as to the use and custody of the funds were imposed by the commission stating:

The Commission's order requires more than a mere bookkeeping detail. It in effect directs [the taxpayer] to retain custody of the moneys or its equivalent until further disposition is directed. * * * [*Mutual Telephone Co. v. United States, supra* at 161.]

While we need not and do not address the issue of the continuing validity of *Mutual Telephone*, we note that in the instant case, there were no limitations placed on the use and custody of the funds in question, and petitioner was not under any duty to hold in reserve any part of the collections. Rather, it was only required to make bookkeeping entries from which

the amount of these funds could be determined pending further order of the ICC.

Petitioner emphasizes that its cash on hand at all times exceeded the funds represented by the bookkeeping entries. But there is nothing in the record indicating that any of the cash on hand was restricted or segregated to reflect the entries, or that petitioner was required or expected to do so. Although the ICC ultimately fashioned a crediting mechanism whereby petitioner was required to provide services to certain customers of a value equivalent to the Rider R amounts without additional recompense, petitioner had unfettered control of all funds collected from its customers for services provided, including the Rider R amounts. It is simply too late in the history of the tax law to argue that such amounts are not taxable in the year of receipt.

Finally, petitioner argues that the Rider R funds at issue here are not taxable in the years of receipt because of the application of the trust fund doctrine. The essence of this doctrine is that if a taxpayer receives funds as an agent or trustee for a designated purpose, such funds are not taxable to such taxpayer. We do not see any reasonable application of this doctrine to the facts before us.

In *Seven-Up Co. v. Commissioner*, 14 T.C. 965, 977 (1950), we held that certain amounts received from bottlers to be used for advertising were not income to the taxpayer, stating that:

While petitioner had the right to receive the bottlers' contributions under its agreements with them, all the facts and circumstances surrounding the transaction clearly indicate that it was the intention of all of the parties concerned that these contributions were to be used to acquire national advertising for the 7-Up bottled beverage and for that purpose only, and that petitioner was to be a conduit for passing on the funds contributed to the advertising agency which was to arrange for and supply the national advertising. * * *

See also *Ford Dealers Advertising Fund, Inc. v. Commissioner*, 55 T.C. 761 (1971), affd. per curiam 456 F.2d 255 (5th Cir. 1972); *New York State Association of Real Estate Boards Group Insurance Fund v. Commissioner*, 54 T.C. 1325 (1970); *Angelus Funeral Home v. Commissioner*, 47 T.C. 391 (1967), affd. 407 F.2d 210 (9th Cir. 1969).

In the facts before us, the funds at issue were *not* "impressed with a trust upon their receipt" (*Broadcast Measurement*

*Bureau, Inc. v. Commissioner*, 16 T.C. 988, 997 (1951)) but rather were received from the SC 79 customers for gas and related services furnished to them and were paid fully and unconditionally. There was no agreement or arrangement between the SC 79 customers (or any other customers) and Illinois Power, or between the ICC and Illinois Power on behalf of these customers that impressed these funds with a trust. Rather, petitioner was merely required by the ICC to keep bookkeeping entries recording the amounts of the revenues which were otherwise used in the same manner as other revenues received from customers. Accordingly, we find the trust fund doctrine inapplicable here.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

DAWSON, FAY, STERRETT, GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, and WRIGHT, *JJ.*, agree with this opinion.

SIMPSON and GERBER, *JJ.*, did not participate in the consideration of this case.